# XUSPO SENTENCING CONSULTANTS
## MITIGATION & INVESTIGATIONS

**Comprehensive Sentencing Mitigation Report**
for
Client's Name
Dkt. No.: 22-cr-00096-CKK-6

According to the provisions of 18 U.S.C. § 3553, the Court shall impose a sentence that is sufficient, but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the Court shall consider, *inter alia*, (1) the nature and circumstances of the offense, and the history and characteristics of John Hinshaw, and (2) the need for the sentence imposed, as set forth in 18 U.S.C. § 3553(a)(2).

In consideration of the sentence that must be imposed in this case, John Hinshaw respectfully requests that the Court consider the following information in mitigation of his sentence:

## Sources of Information

- Interviews with John Hinshaw, client, and Alfred Guillaume, III, attorney.
- Interview with Sherry Baker, Senior U.S. Probation Officer.
- Interviews with Brenda Hinshaw, spouse.
- Interview with Mary Kate Hinshaw, daughter.
- Presentence Investigation Report dated March 29, 2024.
- PACER docket entries for 22-cr-00096-CKK USA v. Handy et al.

## *Current Posture of* John Hinshaw

On October 14, 2022, Mr. Hinshaw was charged in a Two-Count Superseding Criminal Indictment with Count 1: Conspiracy Against Rights, in violation of 18 U.S.C. § 241 and Count 2: Freedom of Access to Clinic Entrances Act, in violation of 18 U.S.C. § 248(a)(1) & (2).



10901 Rhode Island Ave.
Suite 344
Beltsville, MD 20704

| | |
|---|---|
| PHONE | 240-583-1864 |
| FAX | 301-567-5727 |
| EMAIL | turner@xuspo.com |
| WEBSITE | www.xuspo.com |

On August 29, 2023, Mr. Hinshaw appeared in the U.S. District Court for the District of Columbia located in Washington, DC, and was found guilty by a jury of both counts in the Superseding Criminal Indictment.

February 6, 2018, John Hinshaw appeared in the U.S. District Court for the District of Maryland located in Greenbelt, Maryland, and pled guilty a Criminal Information charging him with Count 1: Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 USC § 1962(d) and Count 2: Assault with a Dangerous Weapon in Aid of Racketeering, in violation of 18 USC § 1959(a)(3).

Mr. Hinshaw was originally arrested for this offense on March 30, 2022, in Levittown, New York, and was released on personal recognizance with pretrial conditions. At the conclusion of his trial on August 29, 2023, the Court remanded Mr. Hinshaw into custody.

## *Offense Conduct*

On October 22, 2020, Mr. Hinshaw conspired with several others including Lauren Handy, Jonathan Darnel, Jay Smith, Paulette Harlow, Jean Marshall, Heather Idoni, William Goodman, Joan Bell, and Herb Geraghty to obstruct access to the Washington Surgi-Clinic, a provider of women's reproductive health services, located in Washington, DC.

## *Codefendants/Related Cases*

Lauren Handy, Dkt. No.: 22-cr-00096-CKK-1, On August 29, 2023, Handy was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 14, 2024, at 9:00 a.m.

Jonathan Darnel, Dkt. No.: 22-cr-00096-CKK-2, On August 29, 2023, Darnel was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 15, 2024, at 11:00 a.m.

Jay Smith, Dkt. No.: 22-cr-00096-CKK-3, On March 1, 2023, Smith pled guilty to Count 1 of a One-Count Second Superseding Criminal Information charging him with Count 1: Freedom of Access to Clinic Entrances, in violation of 18 U.S.C. § 248(a)(1) & (b)(2). On August 7, 2023, Smith was sentenced to 10 months imprisonment and 3 years supervised release.

Paula Paulette Harlow, Dkt. No.: 22-cr-00096-CKK-4, On November 16, 2023, Harlow was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 16, 2024, at 10:00 a.m.

Jean Marshall, Dkt. No.: 22-cr-00096-CKK-5, On August 29, 2023, Marshall was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 15, 2024, at 1:30 p.m.

Heather Idoni, Dkt. No.: 22-cr-00096-CKK-7, On August 29, 2023, Idoni was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 14, 2024, at 1:30 p.m.

William Goodman, Dkt. No.: 22-cr-00096-CKK-8, On August 29, 2023, Goodman was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 14, 2024, at 3:00 p.m.

Joan Bell, Dkt. No.: 22-cr-00096-CKK-9, On August 29, 2023, Bell was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 15, 2024, at 3:00 p.m.

Herb Geraghty, Dkt. No.: 22-cr-00096-CKK-10, On August 29, 2023, Geraghty was found guilty by a jury of both counts in the Superseding Criminal Indictment. Sentencing is scheduled to be held on May 15, 2024, at 9:00 a.m.

### *Statutory Penalties*

Count 1: Conspiracy Against Rights (18 U.S.C. § 241) – the maximum term of imprisonment is 10 years, not more than 3 years supervised release, and a fine of $250,000.

Count 2: Freedom of Access to Clinic Entrances Act (18 U.S.C. § 248(a)(1) & (2)) – the maximum term of imprisonment is 1 year, not more than 1 year supervised release, and a fine of $100,000.

### *Impact of the Plea Agreement*

Mr. Hinshaw exercised his right to a jury trial. There is no plea agreement in this case.

### *Guideline Calculations*

In the PSI, the Probation Officer contends that Shampy Holler, an unnamed victim to the Indictment, was physically restrained during the offense by being forced to lay on the floor due because codefendants would not allow her into the clinic. It is the Probation Officer's position that a 2-level upward adjustment is warranted, pursuant to USSG §3A1.3.

USSG §3A1.3 states that if a victim was physically restrained in the course of the offense, increase by 2 levels. USSG §3A1.3, Application Note # 1 directs that the definition of "physically restrained: is defined in the Commentary to USSG §1B1.1.  Pursuant to USSG §1B1.1, Application Note # 1(L), "physically restrained" means the forcible restraint of the victim such as by being tied, bound, or locked up.

There is no evidence Shampy Holler or any other victim was physically restrained. Due to experiencing labor pain and in need of immediate medical attention, Ms. Holler chose to lay on the hallway floor outside the clinic after being denied entry by Mr. Hinshaw's codefendant(s). She was not forced by Mr. Hinshaw or any of his codefendants to get on the ground. When Ms. Holler tried to get up from the floor, codefendant Marshall pushed her back down to prevent her from entering the facility as clinic staff attempted to allow her access. Ms. Holler was free to leave, and the conduct of codefendant Marshall could only be considered simple assault and does not equate to the sentencing guidelines definition for "physically restrained." Thus, the 2-level upward adjustment applied by the Probation Officer for this specific offense characteristic is not warranted.

Additionally, Mr. Hinshaw does not concede that Patient Ashley Jones or Shampy Holler were vulnerable victims and a 2-level upward adjustment pursuant to USSG §3A1.1(b)(1) is applicable in this case.

A vulnerable victim means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under USSG §1B1.3 – _Relevant Conduct_ and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct, pursuant to USSG §3A1.1, Application Note No.: 2.

In _U.S. v. Cabellero_, 277 F.3rd 1235, 1251 (10th Cir. 2002), the Court ruled this enhancement is only available in cases where the victim is uniquely vulnerable as compared to the typical victim of the offense. Additionally, the Court ruled in _U.S. v. Zats_, 298 F.3d 182 (3rd Cir. 2002) the vulnerable victim adjustment is appropriate where (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have know of this susceptibility or vulnerability; and (3) that vulnerability or susceptibility facilitated the defendant's crime in some manner.

In the Government's memorandum, they represent the vulnerable victim enhancement is applicable in Mr. Hinshaw's and his codefendant's cases because the Court upheld the application of the enhancement in _U.S. v. James_, 139 F.3d 709 (9th Cir. 1998). In _James_, the defendant, after noticing the bank teller was pregnant, threatened to come back and kill her and her baby if she gave him any

trackers, alarms, or magnets. The defendant attempted to take advantage of the teller's pregnancy by frightening her and convincing her to do what he wanted to rob the bank. The fact that she was pregnant was exploited by the defendant and used to facilitate his robbery of the bank.

However, the offense conduct in _James_ that warranted the enhancement for vulnerable victim is not analogous to the offense conduct in Mr. Hinshaw's case. The fact that patients Ashley Jones and Shampy Holler were pregnant did not make them uniquely vulnerable or susceptible to having their rights to enter the abortion clinic violated any more than Nurse K, Medical Specialist H, and Clinic Administrator B having their rights denied providing medical services to the patients. Therefore, Mr. Hinshaw believes a 2-level upward adjustment for Vulnerable Victim pursuant to USSG §3A1.1(b)(1) is not warranted in his case.

In addition to these objections, we believe the Probation Officer has incorrectly calculated the applicable sentencing guidelines in paragraphs 73-94 of the Presentence Investigation Report.

The Superseding Indictment states that three abortion clinic employees were present when the instant offense occurred. Although the Probation Officer treated Count 1 as a separate group from Count 2, we believe her grouping calculations have not been applied accurately.

USSG §3D1.2, Application Note # 8 states "a defendant may be convicted of conspiring to commit several substantive offenses and also committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses." Also, USSG §1B1.2, Application Note # 3 states that a "conviction on a conspiracy count charging conspiracy to commit more than one offense is treated as if the defendant had been convicted of a separate conspiracy count for each offense that he conspired to commit."

For the conspiracy conviction in Count 1, this would result in three additional "counts" based on the argument that Mr. Hinshaw's actions also obstructed the rights of Nurse K, Medical Specialist H, and Clinic Administrator B to provide and seek to provide reproductive health services.  This should have resulted in the following counts to be used to calculate Mr. Hinshaw's total offense level: Count 1A: Conspiracy Against Rights of Nurse K; Count 1B: Conspiracy Against Rights of Medical Specialist H; Count 1C: Conspiracy Against Rights of Clinic Administrator B; Count1D: Conspiracy Against Rights of Ashley Jones (Patient A); and Count 2.

5

Counts 1A, 1B, & 1C would not group with any other count.  However, Count 1D and Count 2 pertain to acts committed against Ashley Jones and would form one group, pursuant to USSG §3D1.2(a).

For offenses in violation of 18 U.S.C. §§ 241 and 248, the applicable guideline is found in USSG §2H1.1 – *Offenses Involving Individual Rights*.

The sentencing guidelines calculations for this offense based on four groups would be:

### *Group 1 (Count 1A – Nurse K)*

*Base Offense Level*: During this conspiracy, there were allegedly at least 9 participants. If the offense involved two or more participants, the base offense level is 12, pursuant to USSG §2H1.1(a)(2). **12**

*Specific Offense Characteristics*: None. **0**

*Victim Related Adjustment:* None. **0**

*Adjustment for Role in the Offense:* None. **0**

*Adjustment for Obstruction of Justice*: None. **0**

*Adjusted Offense Level*: **12**

### *Group 2 (Count 1B – Medical Specialist H)*

*Base Offense Level*: During this conspiracy, there were allegedly at least 9 participants. If the offense involved two or more participants, the base offense level is 12, pursuant to USSG §2H1.1(a)(2). **12**

*Specific Offense Characteristics*: None. **0**

*Victim Related Adjustment:* None. **0**

*Adjustment for Role in the Offense:* None. **0**

*Adjustment for Obstruction of Justice*: None. **0**

*Adjusted Offense Level*: **12**

## *Group 3 (Count 1C –* **Clinic Administrator B***)*

*Base Offense Level*: During this conspiracy, there were allegedly at least 9 participants. If the offense involved two or more participants, the base offense level is 12, pursuant to USSG §2H1.1(a)(2).                    **12**

*Specific Offense Characteristics*: None.                                     **0**

*Victim Related Adjustment:* None.                                            **0**

*Adjustment for Role in the Offense*: None.                                   **0**

*Adjustment for Obstruction of Justice*: None.                                **0**

*Adjusted Offense Level*:                                                     **12**

## *Group 4 (Count 1D – Ashley Jones (Patient A) & Count 2)*

*Base Offense Level*: During this conspiracy, there were allegedly at least 9 participants. If the offense involved two or more participants, the base offense level is 12, pursuant to USSG §2H1.1(a)(2).                    **12**

*Specific Offense Characteristics*: None.                                     **0**

*Victim Related Adjustment:* None.                                            **0**

*Adjustment for Role in the Offense*: None.                                   **0**

*Adjustment for Obstruction of Justice*: None.                                **0**

*Adjusted Offense Level*:                                                     **12**

**MULTIPLE COUNT ADJUSTMENT**

| Group | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 (Ct. 1A) | 12 | 1 |
| Group 2 (Ct. 1B) | 12 | 1 |
| Group 3 (Ct. 1C) | 12 | 1 |
| Group 4 (Cts. 1D & 2) | 12 | 1 |

Total Number of Units: 4
Greater of the Adjusted Offense Levels Above: 12
Increase in the Offense Level (USSG §3D1.4): +4
Combined Adjusted Offense Level: 16                                           **16**

_Chapter 4 Adjustments:_ According to the PSI, Mr. Hinshaw does not have any prior convictions or any criminal history points. Due to the applicable guideline for the offenses of conviction being found in USSG §2H1.1, he is not eligible for a 2-level downward adjustment for Zero-Point Offenders, pursuant to USSG §4C1.1(a)(8). No other Chapter 4 Adjustments are applicable in this case.     **0**

_Acceptance of Responsibility:_ None.     **0**

_Total Offense Level:_     **16**

### _Criminal History_

The United States Probation & Pretrial Services Office completed a Presentence Investigation Report and determined Mr. Hinshaw did not have any prior convictions or adjudications. As a result, his criminal history score is zero (0). A criminal history score of zero (0) establishes a Criminal History Category of I.

We thoroughly reviewed the Presentence Investigation Report and did not find any calculation errors that would negatively impact the client's criminal history score or Criminal History Category.

**Advisory Guidelines Range**

Based on a total adjusted offense level of **16** and a Criminal History Category of **I**, Mr. Hinshaw's advisory sentencing guidelines range is **21-27 months** imprisonment. This guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment, pursuant to USSG §5C1.1(f).

### _Applying the Factors of 18 U.S.C. § 3553(a) to_ **John Hinshaw**

John Hinshaw_'s History and Characteristics_

The following information regarding Mr. Hinshaw's history and characteristics is offered as a supplement to the presentence investigation report conducted by the U.S. Probation and Pretrial Services Office.



John Hinshaw

John Hinshaw was born on December 27, 1954, in Queens, New York. Mr. Hinshaw is the third oldest of five children born from the legal union of Harold and Mildred Hinshaw (nee: Gilfoyle). Mr. Hinshaw reported his parents married in 1949.

John's father, Harold Hinshaw, died from complications with his heart in 1970 when John was only 15 years old. Mr. Hinshaw reported his mother died in 2005 from stomach cancer. After his father's death, John reported 's mother, Mildred, struggled financially at times as a widow with five children, but she was able to maintain a roof over their heads and put food on the table. John stated he enjoyed a pleasant upbringing, and there is no history of abuse or neglect in his childhood.



John (l) with his parents, Mildred (c) and Harold (r)

From his parents' marriage, Mr. Hinshaw stated he has four siblings: Diane Hinshaw (age 73) resides in Nacogdoches, Texas; Richard Hinshaw (age 72) resides in Linbrook, New York; Arlene Winters resides in Nacogdoches, Texas; and Lynn Burnstein (deceased). Mr. Hinshaw reported his sister, Lynn, died at the age of 54 from lung cancer, and he has a close relationship with his surviving siblings.

 

(L) John with all his siblings as children; (R) John with his surviving siblings

In March 1979, Mr. Hinshaw initially met the love of his life, the former Brenda Kelly, at a function hosted by a mutual friend at a local Irish pub. When they met, John was 24 years old and fresh out of college while Brenda was 19 years old and still in college. In July 1979, they met again at another function hosted by the same friend, and John finally worked up the nerve to ask Brenda out on a date. Both John and Brenda love baseball and their favorite teams just happened to be playing each other the following month. So, their first date was to a New York Mets v. St. Louis Cardinals baseball game in August 1979, and they have been inseparable ever since.

According to Mrs. Hinshaw, her husband is a romantic and proposed to her in the same Irish pub where they first met, and they married several years later on May 9, 1987, in her family's church, the St. John of God Parish in New York.





John and Brenda Hinshaw (nee: Kelly)

Prior to getting married, John and Brenda thoroughly discussed almost every aspect of marriage to make sure they were on the same page. When it came to the subject of having children, they both agreed they would have as many children as God allowed them to have. Brenda stated she agreed to stay home to take care of their household and raise the children while John would work, often two jobs. From their union, the couple have six children: John Paul Hinshaw (age 35) resides in Levittown, NY; Mary Kate Hinshaw (age 33) resides in Oxford, Mississippi; Kelly Marie Hinshaw (age 31) resides in Levittown, NY; Theresa Brenda Davila (age 29) resides in Long Island, NY; Bernadette Veronica Ventrone (age 27) resides in Long Island, NY; and James Harold Hinshaw (age 24) resides in Levittown, NY.



John and Brenda (seated) surround by their six children

 

(L) A sign John presented to his daughter at her wedding; (R) John being embraced by his four daughters at the wedding reception

Additionally, Mr. Hinshaw is a grandfather and has three grandchildren: Monica (age 3), Andrew, Jr. (age 2), and Charlotte (age 4 months). John has not yet met his youngest grandchild because she was born since he has been detained for this instant offense.

 

John with spending time with his grandchildren, Monica and Andrew, Jr.



John's youngest grandchild, Charlotte

Mr. Hinshaw's oldest daughter, Mary Kate, was interviewed for this report. She stated her mother and father were wonderful parents and excellent role models to she and her siblings. Although her dad worked a lot so that their mother could stay at home with the children, there is never a time when she doesn't remember him being present in their lives. Mary Kate stated her father would take her to school each morning and be there to pick her up in the afternoon. Looking back, she still can't figure out how he was able to work two jobs yet always find a way to spend quality time with his family.

Mary Kate stated her father made his children his priority and poured everything he could into raising them to be loving, caring individuals who have a relationship with God. As a parent, her father recognized he could not treat each child the same, but he treated them fairly. Also, he has the unique ability to make each of them feel as if they are his favorite. Mary Kate described her father as "the calming presence" in their family. He frequently offers reassurance that things are going to be okay, even when it does not look like it will be. This attribute was witnessed when their family home was partially destroyed by a fire in late 2021, and her parents and three siblings had to be displaced while repairs were made. Throughout the entire ordeal, Mary Kate stated her father kept his faith and continuously told them that everything would work out and they would be able to return home one day, which occurred in May 2023.

John's religious faith is the core of his being. In a letter written to the Court, John's pastor, Reverend Ralph Sommer, stated "John is truly committed to his faith and helping others. He lives his faith and commitment to those who can't speak for themselves." In retrospect, John's wife believes John would have gone into the priesthood if he had not met her. According to Mrs. Hinshaw, her husband grew up in a religious household, but it was not until his college years when he developed a closer relationship with God and wanted to learn more about his faith. During his college years, John also became more interested in the Pro Life movement. After the birth of their first child, the Hinshaws moved to Levittown, NY, in 1994 and began attending the Saint Bernard's Roman Catholic Church in Levittown, NY. At Saint Bernard's, John is an active volunteer in the Baptism Ministry, the Marriage Preparation Ministry Team, and the Knights of Columbus.

Mrs. Hinshaw stated she was unaware John was going to Washington, DC, to participate in the "rescue" that occurred during this instant offense. Although she is also a Pro Life supporter, he intentionally did not tell her about his plans because he knew that she would have not approved of his participation. This is the first time they have been apart for an extended period, but she and their children are supportive of him and will enthusiastically welcome him back home upon his release from imprisonment. Mrs. Hinshaw summed up her interview by stating that this period in their lives will pass, and she has no doubt she and John will resume their lives together, taking daily walks, working in their church, and spoiling their grandchildren.

<u>Substance Abuse and Treatment</u>

Mr. Hinshaw admits he consumes alcohol. However, he has never consumed alcohol excessively and none of his family members have ever expressed any concerns about his usage of alcohol.

14

John reported he has never used an illegal controlled substance, he has never abused any prescription medication, and he has never received any counseling or treatment for the abuse of drugs or alcohol.

_Mental Heath_

Mr. Hinshaw reported he has never knowingly experienced any mental health illnesses, and he has never received any mental health counseling or treatment.

_Employment_

For most of his adult married life, Mr. Hinshaw has worked two jobs to support his wife and children. John has an extensive history of working with the mentally ill and helping those who are less fortunate. When he was arrested for this instant offense, he was employed as a residential counselor for the Mental Health Association of Nassau County, NY. John began working for this agency part-time in 1989 and became a full-time employee in 2019. Due to being detained for this instant offense, Mr. Hinshaw's position was terminated. According to John, his supervisor has advised him that he would be eligible to be rehired once he has been released from imprisonment.

_Education_

Mr. Hinshaw graduated in 1973 from East Meadow High School located in East Meadow, NY. In 1979, he graduated from St. John University located in Queens, NY, with a Bachelor of Arts degree. According to John, he majored in psychology and minored in theology.

_Community Support_

In addition to interviews conducted with Mr. Hinshaw's wife and daughter, numerous family members and close friends submitted letters of support that have been appended to this report for the Court's benefit.

Upon reading these letters, it is amazing to see so many individuals describe John as being a kind, gentle, selfless, and emphatic man who only shows compassion to others, particularly individuals who suffer from mental illness. Almost everyone talks about different moments in John's life when he is helping others. Also, they are genuinely shocked to learn of his involvement in this instant offense that is out of character for the man that they know and love. However, all these individuals remain supportive of John, and several will likely be present at sentencing.

The history and characteristics of Mr. Hinshaw are summed up by stating he is a man who made one of the greatest mistakes in his life but has the support of his family and friends to help him "See It Through."[1] John's life is currently on hold while awaiting the outcome of this case. Prayerfully, he will be able to move forward once a sentence is imposed on May 14, 2024.

## The Nature and Circumstances of the Offense

There are several factors in mitigation of the nature and circumstances of the offense that may be pertinent to the provisions of USSG §1B1.4 - *Information to Be Used in Imposing Sentence (Selecting a Point within the Guideline Range or Departing from the Guidelines)*. Although these considerations do not challenge the propriety of the guilty plea and finding of guilt by the Court, they are relevant to the nature and circumstances of the offense.

Outside of this instant offense, Mr. Hinshaw has led an exemplary life and exhibited otherwise outstanding character. As shown in the presentence investigation report, John has only one prior arrest for trespassing that is scoreable. As a result, he only has one criminal history point, and his Criminal History Category is I. We believe Mr. Hinshaw's minimal criminal record justifies a below-guideline sentence. In *U.S. v. Tomko*, 562 F.3d 558 (3rd Cir. 2009), the defendant was convicted of tax evasion of $225,000 and his advisory guidelines range was 12-18 months. The Court determined that a variance sentence of probation with one (1) year of home detention and a fine of $150,000 was not unreasonable in part because of the defendant's "minimal criminal record." Like *Tomko*, a variance sentence below the advisory sentencing guidelines range in Mr. Hinshaw's case would be a reasonable sentence that is not greater than necessary.

Secondly, Mr. Hinshaw will have to deal with the stigma of a felony conviction for the rest of his life. For John, it has been a "hard pill to swallow" knowing his reputation within the community has been tarnished and that he lost the right to vote and other civil rights due to being "branded" forever as a convicted felon. For a humble man like Mr. Hinshaw, this case has been devastating. As the Court ruled in *U.S. v. Wulff*, 758 F.2d 1121, 1125 (6th Cir. 1985), "a felony conviction irreparably damages one's reputation." Also, "Sometimes [Courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" *U.S. v. Prosperi*, 686 F.3d 32 (1st Cir. 2012).

Thirdly, a term of imprisonment is more significant for a defendant who has never been incarcerated or engaged in violent behavior so a below guidelines

---

[1] See It Through, a poem by Edgar Albert Guest

16

sentence is more just. In _U.S. v. Willis_ 479 F.Supp.2d 927 (ED Wis. 2007), the Court imposed a below guidelines sentence after finding that such a "sentence provided a substantial punishment for someone, like the defendant, who had never before been to jail and who engaged in no violence or dealing herself."

Thus, we believe this Court may consider John's lack of a criminal record, the stigma of a felony conviction, and the impact of a term of imprisonment on someone who has never engaged in violent behavior as mitigating factors that justifies a variance sentence that is below the advisory sentencing guidelines range.

### _The Need for the Sentence Imposed to reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense_

A sentence at the low end (21 months) of or below the advisory sentencing guidelines range would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. This is especially so because Mr. Hinshaw is a 69-year old man who does not have a violent history. He is passionate about his beliefs, and he understands he must be held accountable for his actions.

### _The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct_

Today, news is broadcast almost instantaneously to everyone and everywhere, The United States Attorney's Office widely broadcasted news of the arrests, indictments, and convictions Mr. Hinshaw and his codefendants that was picked up by local and national media.



https://www.wusa9.com/article/news/crime/anti-abortion-activists-who-blockaded-dc-clinic-found-guilty-on-all-counts-lauren-handy-john-hinshaw-heather-idoni-herb-geraghty-william-goodman/65-9101a154-5631-4ed6-96d1-767049b42bb1

Since the recent ruling by the Supreme Court in *Dobbs v. Jackson Women's Health Organization* and the news that the state of Arizona is seeking to reinstate their pre-Roe ban on abortion from an 1864 law, the topic of abortion and women's reproductive rights have frequently been hot topics in the news.

The public in general and those individuals willing to engage in illegal criminal activity like the crimes committed by Mr. Hinshaw must be made aware of the consequences of committing such acts.

If the client had been the leader or organizer of this conspiracy like Lauren Handy or Jonathan Darnel, a longer sentence of imprisonment may be warranted for deterrence. However, when Mr. Hinshaw's offense conduct is compared to the remaining codefendants, his conduct warrants a sentence that is below or at the low end of the advisory sentencing guidelines range. Mr. Hinshaw has learned his lesson and will not be participating in anymore "rescues."

## The Need for the Sentence Imposed to Protect from Further Crimes by John Hinshaw

Protecting the public from further crimes by Mr. Hinshaw assumes that there will be further crimes. Because of how this case has impacted John's life, it is implausible to think he has not learned his lesson. One cannot fathom Mr. Hinshaw would ever consider participating in anymore "rescues" or committing any other criminal offense.

For most of his life, John has been a law-abiding citizen and an upstanding member of his community. Thus, a lengthy term of incarceration is not necessary in this case to protect society, and the Court's mission to impose a sentence that is sufficient by not greater than necessary can be accomplished through the imposition term of imprisonment that is below or at the low end the advisory sentencing guidelines range.

## To Provide John Hinshaw with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Mr. Hinshaw is a college educated man and a hard-working man who is now 69-years old and contemplating retiring from work permanently to be with his wife and family. Also, he does not have any substance abuse nor mental health issues that need to be addressed. Thus, a term of incarceration is unnecessary to provide educational or vocational training or correctional treatment.

### *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

One of the most difficult and relevant factors this Court must consider is the need to avoid unwarranted sentencing disparities.

According to the United States Sentencing Commission's statistics for Fiscal Year 2023, the national median sentence length for offenses in violation of individual rights was 27 months imprisonment. For the DC Circuit specifically, there was no available information. Thus, a sentence of 27 months in Mr. Hinshaw's case would be in-line with sentences imposed for similarly situated defendants nationally. However, we believe there are sufficient mitigating factors that warrant a sentence that is below or at the low end of the advisory sentencing guidelines range determined by the Court.

### *The Need to Provide Restitution to the Victim*

Restitution is not an issue in this case.

### *Conclusion*

In consideration of the forgoing discussion and analysis, we believe there is ample evidence in mitigation to allow the Court to impose a sentence that is at the low end or below the advisory sentencing guidelines range.

We have attempted to fully address the factors in 18 U.S.C. § 3553(a) that the Court must consider. John Hinshaw respectfully requests that the Court utilizes this information to satisfy its mission to impose a sentence that is sufficient, but not greater than necessary under the circumstances of this case.

The forgoing comprehensive sentencing mitigation report has been prepared on behalf of John Hinshaw at the request of his Defense Counsel, Alfred Guillaume, III, and is submitted in support of sentencing on May 14, 2024, before the Honorable Colleen Kollar-Kotelly, United States District Judge for the United States District Court for the District of Columbia.

Respectfully submitted,

*Turner R. Mebane, Jr.*

Turner R. Mebane, Jr.
XUSPO Sentencing Consultants
Report completed: April 19, 2024

Attachments: Character Letters (31)

37 Hamlet Road

Levittown, New York 11756

November 30, 2023


The Honorable Colleen Kollar-Kotelly

U.S. District Judge

c/o Alfred Guillaume III

1350 Connecticut Ave

Suite 308

Washington, D.C. 20036


Dear Judge Kollar-Kotelly:

My name is Brenda M. Hinshaw, and I am the wife of John Hinshaw. John and I met in 1979 and married on May 9, 1987. We have been married for 36 1/2years. We have been blessed with 6 remarkable children, John Paul (35), Mary Katherine (33), Kelly Marie (31), Theresa(29), Bernadette(27) and James(24).  We have two beautiful grandchildren, Monca age 2 and Andrew, Jr. 10 months and a third grandchild who will be born in January 2024.  We live in Levittown, N.Y. and have lived in our home since 1994.

When I met John, it was his sense of humor and his ability to connect with and engage with people that caught my attention. As I got to know John I learned and continued to learn how committed he is to family, friends and to being an advocate for the socially disadvantaged, those who cannot speak for themselves.

During our life together, John's career has been in the Mental Health Field, working with mental ill adults, some with substance abuse issues as well. His career began as a part-time job in 1989 as a Weekend Counselor in Community Residence operated by the Mental Health Association of Nassau County. He took it initially to supplement our income for our growing family, as he was working in the private sector at the time. Realizing he had a gift and vocation working for and with the Mentally Ill in 1990 he took a fulltime position with a non-profit organization as a Case Manager for the mentally ill. He remained there for over 20 years while continuing his part-time position with MHA. As a Case Manager, John was an advocate for his clients, making sure they received all the benefits and services they were entitled to. After leaving this job he worked for another nonprofit helping mothers and children, some mothers suffering from emotional, mental and substance abuse issues. From there in 2019 John came full circle in his career when he took a Case Manager position with MHA and not long after they asked him to work as the Senior Counselor at the Community Residence, he started at in 1989. They needed his skills and

knowledge to help run the residence and work with the residents. He was there until this past September.

Throughout his career, John has had a natural gift and ability working with the mentally ill. He not only made sure that they received their benefits and services, but made time to get to really know them as individuals, their interests, etc. His clients and the residents would seek John out to just talk, normal conversations on any number of subjects. His goal for them was simple, to help them to prepare to move from supervision in a Community Residence to Independent Living, while still having the support of Case Management. This was not a high paying profession, but it brought him great satisfaction. He made a difference and all the while able to support our family. I know he would and will continue to make that difference.

But John Hinshaw, the man I love and respect the most is the husband, father, grandfather, brother and friend. As our relationship deepened and as we got to know each other we discussed marriage and family. We did not make this decision lightly. When we married, we meant what we promised each other before God, to Trust God and each other. And to have a sense of humor. We have shared joys, laughter, sorrows and loss. It hasn't always been easy, we've not always agreed on matters large and small, but we promised to work through all challenges with love, respect and trust. We will continue together to face whatever the future holds for us.

John has always been a loving, kind, respectful and supportive husband, through word and action. There are two significant events over the past two years that highlight the husband John has been to me. Just after Christmas 2021 my elderly father's health begin failing and my parents needed my sister and I with them. John, without hesitation, told me to go to them and stay with them for as long as I was needed.  He knew the importance of family and that I needed to be a daughter. As it turned out I would not return home to my family until February 2022. My Dad was hospitalized, briefly in a rehab facility before passing away on January 20, 2022. I stayed with my mom throughout dad's illness and for a time after his death. John's love and support strengthened me and still does even after almost two years after losing dad. He told me after the funeral to stay with mom as long as I needed to so my sister and I could help mom begin to adjust to life without her beloved husband of over 60 years. The second traumatic incident happened a few days after I went to my parents.  Early on the morning of December 31, 2021, a fire broke out upstairs in our home in Levittown, Thankfully John, our three adult children (John Paul, Kelly and James) who still live in the house and our family dog Panda got out safely. Again, through words and actions John was my and our family's anchor and support.  I wanted to immediately come back to my family. John and all our children insisted that my place was with my parents. In the immediate aftermath of the fire, many decisions needed to be made. When we spoke that day, I said to him you have always emphasized that with our Trust in God and in each other we can get through whatever happens. I told him that day I trust you to take care of the immediate details and decisions that need to be made. And I knew he would be there to help our children begin to deal with what happened. He emphasized to all of us that together as a Family we would get through this and go home. Once I returned to my family John and I worked together to get our home repaired and restored

and we moved back home this past May 2023. This brought us even closer together and reminds me why I fell in love with him and why our love and marriage have only gotten stronger.

John, as a father can best be described by our children, as they each have their own special relationships with him as children and now as adults. What I will share is that from the moment we found out we were pregnant with our first child John embraced the joys of fatherhood. When our John Paul was born John would come home and jump in to help! I watched the bond take root and grow between them. John always helped with our children, an active part of their lives from babyhood to adulthood. It has not been easy to raise and provide for a large family, but he did with love, dedication and humor, even while working two jobs. He always enjoyed planning and organizing family time. He taught all our children badminton and started our yearly Family Badminton Tournament! He planted grapevines and started The Hinshaw Grape Harvest, with games and contests. John also started our Family Saturday Night at the Movies. Every week we'd take turns picking a movie, have popcorn and watch in our living room "Theater." We enjoyed family vacations, especially a road trip to Texas in 1997 to visit his sisters and their families.  As well as trips to the Finger Lakes Region and Virgina. John also shared his love of history, literature, religion, and current events with them and as they got older engaged in many lively discussions, which continue.  Most of all we taught them by words and action how important it is to help and give back to others through our participation in our church's ministries, faith formation and baptism and marriage preparation.

Two years ago, our first grandchild was born, Monica. I have witnessed a beautiful bond grow between them.  Our grandson Andrew, Jr was born in January 2023. He is just beginning to know his grandfather. John loves being a grandfather. John is a loving "Pa" who still has much to share and show his grandchildren and future grandchildren. He has an important role to play in their lives.

John as a brother can best be shared by his surviving brother and sisters. But I would like to share the brother he was to his youngest sister Lynn who died in 2011. Lynn and her family lived in Texas for many years. In the early 2000's she found herself a single mother of 7. Serious circumstances developed and Lynn and her three youngest children, who were still minors, moved back to Long Island and lived with John's mother and oldest sister. John's mother passed away in 2005. Lynn after this was operated on for breast cancer and after this surgery developed a serious respiratory illness. It left her unable to work. John saw how ill Lynn was and stepped in to help. Using his experience as a Case Manager he scheduled and took her to doctor appointments, helped to get her admitted to the hospital.  Using his many years in dealing with social and human services, he helped Lynn to receive proper services and benefits. He also helped arrange her admittance into a Rehab Facility so she could continue her recovery. Throughout her illness Lynn had one wish, with her three younger children, to go home to Texas to be with the rest of her children and two grandsons. Once the Rehab Facility said she was strong enough to travel, John made the arrangements for Lynn and her three children to go back to Texas, medical supplies for Lynn and transportation for her and her children. John rented the van that one of Lynn's adult sons came to NY to drive them home in. Sadly, she passed away in 2011, but because John got involved when he saw her condition, Lynn lived long

enough to be home with all her children and grandchildren. John truly saved his sister's life. Without his love, compassion and help Lynn may have died sooner.

John has always been a good and caring friend. One of his oldest friends was Kevin Clancy. They met in the mid 1970's, sharing many common interests. Their friendship grew and strengthened over the years. He was a groomsman at our wedding and godfather to our daughter Theresa. Kevin became part of our family. In 2015 Kevin was diagnosed with cancer. Keivn was estranged from his brothers and sisters. It was to John and our family that Kevin turned to. John made many trips to upstate N.Y. during the final months of Kevin's life, to visit and help him. Kevin knew he could count on and trust John, because of their deep bond of friendship. John, using his experience in social and human services, helped Kevin with obtaining services, benefits, medical care, finances and rehab. When the time came Kevin entered Hospice Care. While in Hospice, Kevin became comatose, we were called as Kevin had named us as his next of kin. With our daughter we went to be with him. John stayed overnight at Kevin's side. The following night Kevin passed away peacefully with us at his side.  As he had promised Kevin, John took care of making Kevin's funeral arrangements including speaking at the funeral mass. It was very hard on John but because of how much he cared for, respected and loved Kevin, it was his last gift to his friend and "brother."

What John has done for his family, friends and his many clients and many others throughout his life reflects John's love and compassion for others. Compassion is at the heart of everything John has done and will continue to do in and with his life. John is still needed by all of us, as a husband, father, grandfather, brother, friend and as an advocate for the socially disadvantaged, the marginalized of our society.  A recent Sunday gospel reminds me of the kind of man John is. When Jesus told his followers that when he was hungry, that they fed him, clothed and gave him shelter. His followers asked Him when we did this for you? He answered them, "whatever you did for the least of my brothers and sisters you did for me." John has lived and practiced this teaching. He has lived and spent his life helping others. He has done what Jesus taught us, to love one another as Jesus loves us. Our family, friends and society continue to need the daily presence of this man of faith, and his kind, loving, compassionate nature, his wisdom and guidance. My love and respect for John has only grown and deepened and will continue to do so.

 As a parent I have strived to teach my children that actions have consequences. But also, as a parent I know that that each situation requires us to examine all the pieces to bring together the entire picture in order to make a decision on how to proceed. I hope, Your Honor, you will see all the pieces that create the picture of my husband John Hinshaw as you make your decision.

Thank you, Your Honor, for this opportunity to share with you who my husband John Hinshaw is.

Sincerely,


Brenda M.Hinshaw

1102 Fawn Cove
Oxford, MS 38655

November 16, 2023

The Honorable Colleen Kollar-Kotelly
United States District Juge
c/o Alfred Guillarme, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

To The Honorable Colleen Kollar-Kotelly:

My name is Mary Kate Hinshaw, and I am writing this letter on behalf of my father, John Hinshaw. I am 33 years old and originally from Levittown, New York. I teach fourth grade math in Oxford, Mississippi. I came to the teaching profession through Teach for America, which I joined in 2012. I was placed at an elementary school in Clarksdale, Mississippi, in the heart of the rural Mississippi Delta. I remained at my placement school for eight years total, six years more than the original two years required amount by Teach for America. The students and families that I worked with in Clarksdale, located in "the poorest area in the poorest state," in America, grew and changed my heart in ways that will never leave me. For me, teaching will never be just a job, but will always a way to give of myself in service of others in some small way. I share these details with you not to laud myself, but to help provide a small picture into who I am as a person and the values that have guided the decisions that I have made in my life. These are values that were instilled in me from a young age from my father, John.

There is much to be said about my father's career and professional life that provides significant insight into his character, and I will get to that, but first I would like to tell you a little bit about my father as a dad, as the man who raised six children. He worked long hours to support his family, and though he never complained, I was always aware of the sacrifices that he was making for us. In spite of the fact that he worked a lot, I do not recall his absence as the most significant part of my life growing up. Instead, I remember his presence. He would drive me to elementary school in the mornings and we would make up poems together. As I got older, he was the one making time in his busy work schedule to get me to school early for science labs and to pick me up from whatever club I was attending on any given day to get me to my after-school job on time. When I was in high school, he would make me pots of coffee on the weekends when I was trying to stay up late to study for midterms and final exams, and he was the one who lent a listening ear to my complaints of "girl drama" that plague many high school friendships. He was the one who took me to visit colleges, and when I picked a school 500 miles away from home in North Carolina, he was the one driving back and forth to get me there, never complaining, but instead just enjoying the time it gave us together. I was his stubborn, independent child, the one who would never be told no; and to his credit, he never tried to clip my wings, just tried to help the wind blow to guide

them in the right direction. He was the one I called the first time I got a flat tire, because in spite of the fact that he really couldn't do much to physically help me all the way in Mississippi, he's the one I always call when something goes wrong. My dad taught me to ask questions, to read and learn all I can about the subjects I love, and to always do the right thing, even when it's the hardest thing. When I am upset or panicking about something, his is the voice in my head saying, "Mary Kate- it's going to be ok."

One of my very earliest memories is of a hallway. I am two years old and my dad is carrying me down that hallway, pausing so that I can look at the painting hanging on the wall of my favorite of the Seven Dwarves, "Dopey." I don't recall this in my memory, but I know now that this hallway is in the Children's Wing of St. Francis Hospital & Heart Center on Long Island, and that I had just had heart surgery to repair a coarctation of my aorta. I do recall this in my memory: in an unfamiliar place, my dad's arms are one of the safest places I've ever known.

My father has been that safe place for many people, personally and professionally, throughout his almost 69 years of life. My father has worked his whole adult life in service of the poor, the disadvantaged, and the vulnerable. His heart is open and his hands ready to help those who live on the fringes and margins of society, whom many have been willing to forget about or ignore altogether. When I was a child, he worked during the day as a case manager for mentally ill or disabled adults (often, these people also suffered from substance abuse problems); and at night as a supervisor at a residential group home for adults who were not currently able to live on their own. My father operated with firmness and compassion in these roles as he worked to help them gain care and skills to lead the most fulfilling lives of which they were capable. His clients came to rely on and trust him as someone who would help them with their medical, housing, and personal needs, not just because it was his job, but because they knew he truly cared about them as people. He looked beyond their disabilities or disadvantages and treated them with the dignity that they were deserving of simply by value of being human. I always understood that he truly believed in the importance of the work he was doing on behalf of the disadvantaged and often marginalized people that he worked with. He was still working at the residential group home as of earlier this year. Seeing him get older, I have often asked him when he was going to retire, but one of the things he kept telling me was that there was a shortage of reliable people who wanted to come work at the program, and he felt very strongly that he could not leave his co-workers or the residents until he knew for certain that they were in good hands. Wanting to see my father have some time to enjoy his retirement, I was frustrated, but not surprised: he has so often put the good of others before his own.

My father also worked for a time as the Vice President of Operations at Good Counsel Homes, a program for single, homeless expectant mothers that provides them with a place to live, education and support during their pregnancy and in taking care of their babies when they are born, as well as support for becoming independent and employable members of society upon leaving the housing/program. One of the things that I have always admired most about my father is that he is not, in any sense of the word, a hypocrite. He can never be accused of working for the good of the unborn

without also working to put measures in place to support those babies and their mothers after birth. In his role as Vice President of Operations, as well as in his own personal time as a crisis pregnancy counselor, he has worked to provide support for mothers to be able to bring their babies into the world safely and to be taken care of.

My father is not perfect by any means, but he believes strongly in doing the right thing according to his Catholic faith. His whole adult life has been guided by this faith, which has never been clearer than in the way he taught me, both explicitly and by example, to "love my neighbor as myself."  The very core of his identity, the standard by which he judges himself as a good man, is if he can say, completely honestly, at any given moment, that he has done so. He taught me to honor and love life in all its forms, from the unborn child, to the stray cat, to the mentally disabled man on the street, to the elderly or sick woman in their last months of life. He was a vegetarian for a long time so as not to be accused of supporting cruelty to animals (and only stopped being a vegetarian when he was diagnosed with diabetes and his doctor urged him to make significant changes to his diet and nutrition for his health and well-being). He took me and my siblings to Washington, D.C. for the March for Life every year beginning when we turned 7, and helped us to understand that the most vulnerable among us need our most careful protection. When his sister, my aunt, was suffering from cancer and hadn't been able to leave her house in weeks, my dad went into her house and carried her out to the doctor. He took charge of her medical care and when it became clear that her condition had become untreatable, he made arrangements for her to return to Texas, where her heart and several of her children were, so that she could pass away with dignity and peace. I know that every important decision that he has made in his life is bound up in his desire to love, honor, and serve every life as his own.

My father will be 69 years old this December. He has been a productive, contributing member of society for the entirety of his adult life. He has been a devoted and loving husband, father, friend, son, uncle, brother, and employee; and I have no doubt that he will continue to be if and when he is able to re-integrate into society following his incarceration. Over the last two years, he has added grandfather to his list of titles. He lost his father when he was only 15 years old. I never got to know his dad, and so seeing my dad become "Grandpa" has been one of the greatest joys of the last few years. In January, I will welcome my first child, and I pray that he or she will get to know their Grandpa as a person as fully as I have been able to.

Thank you for taking the time to read and learn a little bit more about my father. I appreciate the careful consideration you are giving to the matter of sentencing at hand.

Sincerely,

Mary Kate Hinshaw

November 17, 2023
Bernadette V. Ventrone
4 Shore Place
Lindenhurst, NY 11757

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

RE:    John Hinshaw

Dear Judge Kollar-Kotelly,

I write this letter with a feeling of hope and with the purest of intentions. I wish to portray to you the character of John Hinshaw and display to you who he is to the world, but also who he is to me. Let me start by introducing myself. My name is Bernadette Ventrone (maiden name: Hinshaw) and I am twenty-seven years old. I am the mother of the most precious little girl, Monica Helena Ventrone. My husband Michael Ventrone and I have been married for four and a half years. John Hinshaw is my Dad. Out of his six children I am number five and his fourth and youngest daughter. I have five siblings; John Paul, Mary Kate, Kelly, Theresa, and James. My mom is Brenda Hinshaw; she and my father have been married for thirty-six years and have known each other for forty-four years. Dad is also the Grandpa of three beautiful little children here on earth and one beautiful little child in Heaven. I have known Dad for all twenty-seven years of my life. To just say John is a good man is not enough. He is an extraordinary human being who possesses the purest of hearts and kindest of souls that I have ever known. There is a quote in one of J. R. R. Tolkien's greatest works, The Fellowship of the Ring (The Lord of the Rings, #1) it states: "All we have to decide is what to do with the time that is given to us." Dad has lived his whole life by those words. He has helped countless amounts of people through both his words and actions. John has a heart and soul that calls him to help the ones who are forgotten. He is an incredible dad; my siblings and I are exceptionally fortunate to have him as our father. He has always been there for us and provided us with a happy life.

John has dedicated his entire life to the service of others. In both his professional and private life, he has made the needs of others his most top priority. One of society's most neglected group of people is the mentally ill. People who are sometimes trapped in their own minds by a wide range of different psychological illnesses. Dad has worked with the mentally ill as both a group home supervisor and a case manager for 35 years. My Dad has always made known his deep love for the world's forgotten people and his vocation to help them. John has given 35 years of his life to ensure the proper treatment of the mentally ill. So many of these individuals were so alone in this big unforgiving world. My dad offered his clients a small glimmer of light in their difficult lives. He ensured their proper medical treatment, proper

housing, usage of government benefits and programs they were entitled to, along with many other responsibilities. In a world where others look passed these human beings in need Dad was someone to his clients, possibly the only one in their lives, who cared for them and their wellbeing with his entire heart. For a lot of my Dad's clients, he was the closest thing they had to a friend. John's work was not something he did for a paycheck like most of the rest of the world. Dad actually cared deeply about and truly believed in the deeds he was doing. Yes, his job did provide money to support his family, but the work he was doing through his profession mattered far more to him, than any sort of paycheck, or recognition.

The mentally ill is just one group of people Dad has dedicated his heart to. He has always cared deeply for the poor. Throughout my life he has emphasized to my siblings and I to care and do what we can for the less fortunate. Through donations and volunteer work I have watched Dad pour out his unconditional love for others. The love he has for the forgotten, is not forced or boastful. His love is pure and truthful; he gives it freely with no expectation of anything in return. Dad has always and will always come from a place of love and empathy for human beings in crisis.

I have thus far provided examples and testimony of who John Hinshaw is and his humanity based upon his professional endeavors and vocations. With my sincere expertise as one of his six children, I will now provide examples of his character as John Hinshaw, my dad. I have always been lifted up by Dad. He has always pushed me to be the best human being I can possibly be. Growing up he always provided for us financially, emotionally, mentally, and spiritually. As adults he still provides for us, not monetarily, but in all the other ways I listed. However, he still provides financially for my mother (his wife). I could share countless amounts of stories to demonstrate my dad's unconditional love and care for us. If I were to write every single story, or situation demonstrating Dad's love and support, there would not be enough paper in the world to hold those stories because they are infinite. Since there is not enough time, or space to write every single example, I will provide the four that are most dear and impactful to me.

As I have already established, Dad's good nature extends to strangers. However, that benevolence also extends to all members of his family and friends as well. John grew up in the suburb of East Meadow, Long Island, New York. He is the son of my dear late grandparents, Mildred and Harold Hinshaw. Dad did not have the easiest teenage/young adult life; his father passed away when John was only fifteen years old. There was a lot of hardship financially, emotionally, and mentally that Dad had to deal with, along with his mother and his siblings. Even with all the sufferings my father faced as a young adult, he still remained determined to do his part to help others in need and make the world a better place. Dad has 4 siblings; Diane, Richard, Arlene, and his youngest sister Lynn, who passed away in March of 2011. When I was in middle school Aunt Lynn had been diagnosed with several different physical illnesses. She became so sick that she was unable to care for herself. My dad took on all responsibilities in caring for her. He drove her to countless doctor appointments, treatments, and facilities. He helped her manage all aspects of her life. Everything that Dad did for Aunt Lynn he did out of the special love all siblings have for each other. Siblings share a special connection and love with

one another that only they can understand. Dad dedicated a number of years to caring for Aunt Lynn, his baby sister. While taking care of Lynn, Dad was still working two full time jobs, as well as being a dad to all of us and a husband to my mom. I am positive this period of time in his life must have been very chaotic and stressful at times, but he never once complained, or regretted what he was doing. When eventually Aunt Lynn passed away it was very difficult for him to deal with, but his determination remained strong and his drive to do good in the world only increased.

I have watched Dad my entire life and have witnessed all the good he has done. I also have been fortune enough to be the recipient of his selfless acts. As I mentioned, in the beginning of this letter, my father is the grandpa, or "Pa" as my daughter calls him, to three beautiful little children here on earth and one beautiful little child in heaven. That little one in God's arms is mine. I was nine weeks pregnant when I lost her to a miscarriage on my twenty-fourth birthday. Before that day I never felt my heart torn to the point where I could physically feel it. My husband and I handled it together and when it was over I felt empty and hopeless. A few days after it was over, my father was the first person I contacted to confide in. I asked him to come see me to give me support because I was in crisis. Dad did not waste a minute to come rescue me; he took a few buses across several towns and walked multiple blocks to get to me. When I opened the door he had a song playing on his phone. The song was the one him and I danced to at my wedding; Paul Simon's "Father And Daughter." He hugged me for a very long time and allowed me to cry and pour out all my very mixed emotions. He listened to it all; the crying, the sorrow, the anger, the rage. Dad was there for me in my darkest and most hopeless moments. We spoke for hours upon hours. Through his words, wisdom, actions, unconditional love, and support I was able to begin to heal emotionally and mentally. I still miss my child all the time and there isn't a day that goes by that I don't think of her, but because of my Dad I was able to heal and find peace with my situation.

My husband Michael and I were blessed with our little Monica a little less than a year after my miscarriage. She is light of our worlds, hearts, and souls. Monica was the first grandchild on both sides of the family and she has brought so much joy to us all. My dad has always loved the little ones; he still talks about us as little ones and how those years were the best ones of his life. Dad and Monica are two peas in a pod; words can't even describe the special relationship they share with one another. They have the most special bond a grandpa and granddaughter can share. The light that enshrines both of them when they are together is brighter than the sun.

I do not believe I have to give a reflection on the beautiful story and relationship my father and mother share. My mother has written her own letter explaining their life together. All I will say is that there is a quote from Theodore Hesburgh, "The most important thing a father can do for his children is to love their mother." Dad has lived this quote to its exact meaning and with every ounce of his heart and soul.

Dad is my superhero and someone I look to with great admiration. He has always supported my mother, my siblings, and I. All I can say is that Dad is an incredible husband, extraordinary father, the best "Pa" in the world, and a beautiful soul who has dedicated his life to

the needs of others. Dad is not a young man he will be sixty-nine in December 2023; he has diabetes, and a history of triple bypass surgery. My mother, siblings, and I worry and fear greatly for his health and for the years to come. The past few months through the conversations and messages I have had with my father I know that he plans to spend every waking moment with his family: my mother, siblings, his grandchildren, and I when this is over and he is home with us. I humbly ask with all purity in my heart that your decision be just and merciful. Thank you for your time.


Sincerely,

The loving and devoted daughter of John Hinshaw,

Bernadette Ventrone

Dear Judge Kollar-Kotelly,

Hello there. My name is James Hinshaw, and I am John Hinshaw's youngest son. I am writing you this letter in hopes to tell you more about my father and his character amongst a few other things. Now Being that my dad and I are generations apart, he is 68 turning 69 years old, and I am 24 years old, you can imagine the amount of topics such as political, social, and economic issues he and I don't agree on; and doing what he did being one of those issues I don't agree with him on. I am incredibly frustrated and hurt that he did this, and a part of me thinks he deserves to face the music. But at the same time, he's my father, so I hope that after everything I tell you, you'll see another side of him and notice this is just a miniscule part of his identity and take it easy on him.

There are a plethora of other things that my father has done that have helped so many people, but let me tell you my story with him. As I  mentioned before he and I disagree on a multitude of things. And given that, there were times I feared that since we disagree on things  meant that he might've stopped caring about me or listening to me and my everyday woes. But in 2019, this thought pattern and anxious thought was put to rest. In the summer of 2019, my mental health was at an all time worst. I was severely depressed and my anxiety disorder was at the highest its ever been. It got to the point I would just rot away in my bed for days on end. I wasn't eating, I was avoiding leaving my house. I was too scared to do anything. I thought I was dying. I was spiraling down a rabbit hole that seemed to have no end insight. And to my slight surprise and shock, my father noticed this and picked up on it. You see, my dad worked with many people who dealt with a variety of mental health issues, so he was keen to notice when people were/are in a mental health crisis, or in my case about to be in one; if not I was already in one.  I remember the night he called me into his room to talk to him. I was dreading it. Again I was a very anxious person at that point and was constantly scared of what was going to happen. He knew that it was going to take a minute before I was ready to come in and talk. But he waited. He would've waited all night if needed. In fact before this night he and I had this conversation that I'll continue in a moment,  that's exactly what he did. There was one night that I was spiraling so bad that I thought I was actually dying and he took me to the ER so I could get a full evaluation to make sure I was okay, and he waited by my side all night from 10pm to 6am the following morning. We didn't really speak while we were at the hospital but every so often he would ask me "How are you feeling?" and I would give just a one word answer. Now that seems small I know, but given how rough shape I was in, knowing he was checking in on me meant everything to me. It made me feel heard and cared for; which would then carry on to the night of our conversation. When I finally got myself out of bed to talk to him, He started off by asking me that first simple question "How are you feeling James?" I said " Okay." He then

gave me that look, that gentle look you give people when you know that they want to say more but are too scared to, to let them know subtly that they can say more. And after that I broke down. He allowed me to cry for however long I needed to. In between cries he just let me talk and tell him everything that I felt was going wrong in my head and life. And then at the end of all that he started to give me all the advice I needed. There's a lot of what he said that I would like to share but I'm going to tell you the one that stuck out to me the most. One of the pieces of advice and guidance he gave me was "It's scary to feel all this James, but youre going to be okay. You're properly thinking that it's not going to be okay. But it will be. It won't magically disappear one day, this is going to be a part of you. I wish I could make it disappear but I can't. Mom and I will help you in any way we can. But It's up to you to want to help yourself. You need to love yourself enough to realize that" I needed to hear that. Not only did I need to hear that I had a support system behind me but also I needed someone to snap me back into myself and remind me that I needed to help myself and love myself again. I got so lost in my struggles that I lost that part of myself.. After that night, and ever since that night, I haven't lost myself, and more importantly I haven't lost that part of myself again. Shortly after that night my father helped me and guided me through the mental health networks to find a psychiatrist so I could get a proper diagnosis and the proper treatment I needed, and from there I could get a better understanding  of what I was going through and how to deal with it. He would drive me to my appointments every single time I had one. He would wait outside, ask me how it went and nothing more. Again he knows how important and confidential these sessions were and never pried, but also made sure to let me know if there was anything I wanted to talk about more with him I could. And when I got prescribed medication for my anxiety, I was obviously very nervous to take it because this was the first time ever I had been given something to take for my anxiety, but he made sure to take the time to explain to me what it was exactly and how it worked.

So as you can see Judge Kollar-Kotelly, I had my doubts about my own father's identity and feared that since he and I have opposite opinions on issues he and I's relationship would be fragile or in an odd place that would make him not care for me. But I was wrong. All I ask is for you to keep this in mind when the time comes.

Thank you so much for your time, your honor.

From,

James Hinshaw

Theresa Bonopartis
480 Halstead Avenue
Harrison, New York 10528

The Honorable Colleen Kollar-Kotelly
United States District Court
c/o Alfred Guillaume, III
1350 Connecticut Ave NW
Suite 308
Washington, DC 20036

Your Honor,

I am writing this letter in support of John Hinshaw who is appearing before you for sentencing. I have known John Hinshaw for over twenty years and can attest to his character and sincere concern for those who are disadvantaged.

John and I worked together years ago at a counseling program called "Hope Family Resources," where he counseled various clients, especially those with mental health issues and substance abuse problems.

Years later we worked together once again at Good Counsel, Inc., which has homes for homeless, pregnant women. In addition to those who are pregnant and homeless. We have a program to assist those suffering from a past abortion. It has been in existence for over 20 years and has helped thousands of women who have been harmed by abortion, emotionally, psychologically, and sometimes physically. I know this is often denied in our society, but I can attest to its truth, because I am one of them. I know firsthand the pain of living with this loss having been coerced myself into an abortion as a teenager and even seeing my dead aborted son. I lived in silent suffering for years because of the refusal to acknowledge this pain, and I know many are still living that way.

It is this pain and suffering that John sought to prevent women who often go into these clinics without being told the development of their babies or the possible consequences they will live with. One only must do a search or visit sites like Silent No More or Operation Outcry to find many such women. Even now, more and more women are living in trauma because they have seen their children as a result of chemical abortions and had no idea of the truth of what they were about to undergo.

I have always found John to be compassionate and self-giving, meeting the needs of those he counseled often at personal sacrifice. He is a good family man with a wife and six children as well as grandchildren who deserve to have him present to them in life. Although he has been found guilty of FACE and conspiracy, he is no danger to anyone, quite the contrary, he has assisted many in the healing of their lives to become productive members of society.

Thank you for your consideration.
Sincerely,


Theresa Bonopartis
Director, Lumina/Hope & Healing after Abortion

November 11, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC    20036

My name is Diane Hinshaw and I am John's older sister.

I am currently retired after having worked in the business
world for 46 years.

John and I were two of five children who grew up in a loving
family atmosphere with two caring parents who instilled in
us, Faith in God, Family values, and the Importance of care
and consideration for others.

John and his wife have instilled these same values in their
own children.

In addition to being a loving husband, father and grandfather,
John has spent his adulthood and career working with and
helping the mentally ill; in addition to being there for his
siblings and their children in times of need.

Diane Hinshaw

**Richard Hinshaw**
**170 Rocklyn Avenue**
**Lynbrook, NY 11563**

November 15, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

Your Honor:

I write to you regarding **John Hinshaw**, currently incarcerated in federal prison in Alexandria awaiting sentencing before you at a date not yet determined.

I write, as **John's brother**, to share my knowledge—developed across a lifetime of mutual love and support, growth and learning, togetherness and shared experiences—of his extraordinary character, manifested in a life devoted to loving and serving others.

I write also as a **former public information officer for the Nassau County, N.Y.  District Attorney's office**, fully cognizant and supportive of our system of justice and law enforcement.

Regarding John Hinshaw's character, you will doubtless receive other personal testaments to the compassion and care for others that has been the hallmark of his life: in his family relationships, friendships, volunteer activities, his professional career in the mental health field, and just in his everyday interactions with anyone whom he sees could use a kind word or a helping hand.

I would like to share one such interaction from his childhood, when in fourth grade he befriended a troubled, bullied classmate who today would probably be diagnosed on the autism spectrum.

Kevin, while very bright, was emotionally high strung, very volatile and prone to violent outbursts when provoked. That, of course, made him a target for other boys in the class, who would cruelly ridicule, torment, and verbally abuse him, willfully provoking him to angry, physical outbursts for which he would be punished.

By befriending this boy—spending time with him during lunch and recess periods, inviting him to our house for John's birthday party, even trying to respectfully intercede with the teacher when she would rightly punish Kevin but not his cruel tormenters—John would of course also be subject to uncorrected ridicule and ostracization from the class bullies. It didn't matter; this poor, troubled little boy needed a friend and an advocate; he found one in my brother.

That is the innate kindness and compassion—and willingness to endure suffering and sacrifice for others—that has *always* been central to John's character; that has been evident in his loving

relationship with my own son who is on the autism spectrum, as well as with my other children; that is so admirable in how he loves and honors his wife, and in his unbounded love and presence in the lives of his children and grandchildren. I saw it in how he interacted with several of our teen-age nephews who had lost their father, how they looked up to and so enjoyed spending time with John, and he with them. And I have seen it in countless interactions with family, friends, neighbors, where John is always there, in matters great or small, when anyone needs support, uplifting, comfort, or any kind of tangible assistance that he is able to provide.

Knowing this about John, having seen it all our lives, it did not surprise me that he would devote his professional career to helping those struggling with mental illness. It is work that many, even while compassionate toward the mentally ill, would find stressful and intimidating. I have had relatives express to me their concern for John's safety working with mentally troubled people.

But John has never been intimidated being with such people. To him it comes naturally—as evidenced by his compassion as a little boy for his troubled friend—to treat everyone, *especially* those who are suffering or vulnerable, as human beings worthy of love and kindness; to see, in *every person*, "a unique and unrepeatable gift of God," as he likes to quote Pope St. John Paul II.

Whether working for various agencies as a case manager, accompanying and advocating for clients as they navigate access to needed services, or in his many years serving the Mental Health Association as an overnight manager of a group home for adults with mental health issues, John has always been perfectly comfortable being with his clients, befriending them, and responding to their needs. He is *happy* doing such work, happy to have the opportunity to make a difference in the lives of people who need his kindness and care.

Now, they need him to be freed from incarceration so he can continue to walk with them on their challenging journeys.

Having worked in law enforcement as spokesman for my district attorney's office, I know that for the sake of the common good, our laws must be respected, and there must be consequences for those who violate them, even as a matter of conscience. Yet I also know, from that experience working with prosecutors, that discernment is sometimes called for in considering whether, in individual cases, an extensive prison sentence might *negatively* impact the common good. And I submit that that is the case here, when a lengthy incarceration of my brother will deprive society at large, and his clients specifically, of the ongoing public service of someone who has devoted his life to doing good works for others.

I respectfully urge your honor to impose a sentence commensurate with John Hinshaw's value to society and his ongoing service to the common good; a sentence that will return him, before too long, to the people who need his kindness and care, his professional skills and experience.


Sincerely,


Rick Hinshaw



# SAINT BERNARD'S CHURCH

3100 Hempstead Turnpike
Levittown NY 11756
(516) 731-4220

November 2023
The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

Dear Judge Kollar-Kotelly,

I am the pastor of Saint Bernard's Roman Catholic parish in Levittown, New York, and I have know John Hinshaw for the past decade as he has been a faithful and involved parishioner.

John and his wife Brenda have been presenting to families who have are bringing their children to be baptized and while Brenda continues without John, we certainly miss him. In past years John and Brenda also were part of the parish's Marriage Preparation Ministry Team.

John is also known for advocating for socially disadvantaged people for any years. For most of his professional life for different agencies and organizations he has worked with and for the mentally ill, including the mentally ill who had alcohol and other substance abuse issues. He has made sure they received services, benefits, housing , counseling, etc.

 At the time of his trial he was working for the Mental Health Association of Nassau County — where he has been working since 1989 in both part time and full-time positions. He truly has a way and gift helping the mentally ill. It's definitely not a high paying position but he has made a tremendous difference in the lives of his clients .

At Saint Bernard's John was a 4th grade  catechist from approximately 1998 to around 2016. We certainly would have welcomed his further involvement with the young people in our program but due to his work for Good Counsel Homes in New Jersey, he wasn't able to return in time to teach.

John is truly committed to his faith and helping others. He lives his faith and commitment to those who can't speak for themselves.

Our parish hopes one day to welcome him back to continue his gentle and thoughtful ministry among us. We miss him and I am confident that upon his return, John will again be a valued and valuable member of our parish community.

In the meantime, we continue to pray for him.

Thank you.

Sincerely,

Rev. Ralph Sommer
Pastor

Dear Judge Kollar-Kotelly,

I have known John Hinshaw for nearly thirty years. My relationship with him is social. We are friends who share common concerns, celebrate joyous occasions, and assist each other in times of need.

I am a senior level adviser and division head to a world renowned business leader and philanthropist.

 During the course of our friendship, I learned the value of achieving satisfaction from helping those less fortunate. As long as I have known him, John has been an advocate for people suffering from mental and social disabilities. John didn't make much money caring for the less fortunate. To support his family he often worked three jobs simultaneously. He never complained about his work load and he was always a pleasure to be around.

John, never exhibited any acts of violence in my presence. He is not a violent man. He is a well informed rational human being who enjoys teaching and discussing a wide variety of issues.  He is someone who will contribute to bettering society whether professionally or as a volunteer.

Having attended the marriages of his children, I know how much he loves his children and grandchildren.

Respectfully,
Allen Roth

10 East End Ave, Apt7A

New York, NY 10075 roth11570@yahoo.com

James R. Dolan, Jr., DSW, LCSW
87 North Walnut Street
North Massapequa, NY 11758

November 14, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

Dear Judge Kollar-Kotelly,

I have known John Hinshaw in a personal and professional capacity for fifty years.  We have both been involved in the mental health field for about 45 years.

John Hinshaw is an exceedingly peaceful, gentle, and compassionate individual.  He would never hurt anyone, in particular a woman.  I understand he was involved in causing a delay for some who came to an abortion clinic, but it is certain that John would not have sought to harm any of the women he encountered.  I am very familiar with John's thoughts about people and life, and that he would have done everything in his power to have prevented anyone on that day from being injured in any respect.

If John Hinshaw has a flaw, it is that he can be overly accommodating and patient with the glaring imperfections found in others.  I do not believe that he has ever had a violent moment in his life.  I learned that he caused some limited disruption, as he engaged in a largely symbolic gesture, but at the same time he would only seek to convey his love and respect for the women he may have come across.  I know he deeply regrets if he was seen in a different light.

I can make these statements about John because I have seen how he handles many of life's challenges.  In my professional capacity I have been fortunate to work alongside John as he provided care to people with serious mental illness.  His ability to help people with that condition to attain wellness and to achieve their life goals is remarkable.  That happened because those served by John found that his gentle and respectful manner, coupled with his extraordinary insights and skills to be highly therapeutic.  Clients in the programs where he worked often expressed their fondness for John and appreciation that he was a part of their life.

With John being incarcerated, the outside world is less caring and less peaceful.  Women are less safe, and that includes those who support abortion.  People with mental illness are less likely to recover.  The longer John is incarcerated the amount of damage done to his wife and children becomes even more devastating.

John Hinshaw is far from being a threat to society, and I know that he will never again engage in an activity that would cause him to run afoul of the law.  John would never allow the turmoil and pain that this situation has brought to his wife and family to be repeated.

For all the goodness, love and healing John has brought to this world, he is deserving of leniency and compassion.  He has already suffered greatly, and I am pleading that he not spend any more time incarcerated.  As has been said, it is more important to do what is right, than to follow the letter of the law.

When considering the sentence, please do not make John an example, as that would be contrary to the example of compassion that he has always shown others.  Instead, please weigh heavily John's long history of providing healing to those in need; that he will not re-offend, and that his goodness and kindness should remain accessible to us all.


Sincerely,

James R. Dolan, Jr., DSW, LCSW

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

November 5, 2023

To the Honorable Colleen Kollar-Kotelly,

I would like to offer some insight into the person of John Hinshaw as lifelong friend. John and I have been friends since high school and he has always been known for his loyalty, good humor, and kindness.

Before I went into the convent in 1992, John and his brother wrote a song for me.  It was set to "I'll take you home again Kathleen" , his version was entitled "They'll send you home again Maureen".   They still sing it when we all get together.  My parents loved both the song and John.

In 2002, my Dad was diagnosed with cancer and died soon after.  John was very kind and helped me as I went through the grieving process.

My Mom had a very severe stroke in 2007 and I was her weekend caregiver.  John and Brenda ( my dear friend from Freshman year of high school) were very supportive.  They lived a short distance from us and both really kept up my spirits during the fourteen years I helped my Mom.  John and Brenda were a huge comfort when Mom died in 2021.

I loved being invited to their house in summer for Hinshaw badminton competitions. The kids loved it and loved playing with their Dad.  They would go camping upstate and the kids would have a ball as it was so different from living in Levittown.  He was an active Dad but often worked two or three jobs so that Brenda could stay home with the kids.

John and Brenda were also active in their parish, St. Bernard, in Levittown.  They ran Baptism preparation programs for parents to be and new parents.  They also helped with Marriage preparation programs over the years.

I hope this gives you more insight into the goodness and kindness of John Hinshaw. Thank you.

Maureen Smith
27 Twin Lane North
Wantagh, NY 11793
516-667-3148

Patricia Posluszny
265A Heritage Hills
Somers, New York  10589


November 12, 2023


The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036


Dear Judge Kollar-Kotelly:

I am writing this letter on behalf of John Hinshaw.  I met John in 1979 on the same day he met his future wife, and my childhood friend, Brenda.  Brenda and I went through the same elementary school and high school and became friends during our high school years.  The story of their meeting, which has been told many times over the years, is reminiscent of the scene from the movie *Good Will Hunting*, in which Matt Damon's character claims, "Well, I got her number", referencing Minnie Driver's character. Brenda and I were out one evening and met up with some friends.  Unbeknownst to us all, Brenda met a guy who was a mutual friend with one of our friends and he asked for her number.  As we were leaving, one of our friends wanted to make sure we got home ok and asked Brenda for her number.  Brenda replied, referring to John, "Ask him – he's got my number!"  John looked just as surprised, maybe even more so, as the rest of us who stood there flabbergasted that this rather unassuming guy expressed an interest in our friend.  Fast forward, I was a bridesmaid in their wedding, have attended Christenings and weddings of their six children, am Godmother to their fourth child, and am considered part of their extended family.

I have loved being a witness to John as father to his six children.  They have a loving, playful, and trusting relationship and I have seen how his children know they can rely on him for sage advice for any problem or concern they may have.  One of my favorite memories during the children's youth was "Saturday Night at the Movies at the Hinshaw's".  I live about an hour and a half from the Hinshaw's and so Brenda and I would make plans to get together on some Saturdays.  After dinner out, we would come home to John and the kids watching the chosen movie of the night.  John was completely engaged with his children and the movie and quite honestly, at times it was hilarious to watch.  After the movie, the kids would then go off to bed and John and I would have a chance to have some philosophical discussions and some playful disagreements.

This would be a good place to tell you, Judge Kollar-Kotelly, that John and I are polar opposites on the political scale.  We definitely have some strong opinions that do not agree, but over the years, never once did we have a disrespectful word between us.  John may be opinionated, however, he will not impose his will or 'shut down' your point of view; in fact, he is very willing to hear your opposing point of view.  John is Pro-Life; I am Pro-Choice.  Yet, I have nothing but the utmost respect for John Hinshaw.  He

has integrity and stands true to his principles.  In complete contrast to his willingness to voice an opinion, he is humble in his service to others.  He is quiet and unassuming about his work with socially disadvantaged and special needs members of the community.  He does not feel the need to let you know about his volunteer work with the Church – the Baptism classes and Marriage Preparation classes that he has given along with his wife, Brenda.  He has never complained about the number of hours or number of jobs he worked to support his family.  Although I do not agree with actions taken by the Pro-life organization, I understand how John's principles and integrity could not let him ignore what he considered to be egregious acts.

Judge Kollar-Kotelly, please, I urge you to consider that John has served his time for his actions.  Please consider that he has had time to think about the consequences of his actions.   Please understand that he has reflected upon how these actions have and will continue to affect his family and that his reflections have certainly informed his decision-making for the future.  John is truly a good person.  Please send him home to his family.

Most sincerely,

Patricia Posluszny

Mr. John Blakeney
149 Carol Road
East Meadow, NY 11554

November 13, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW Suite 308
Washington, DC 20036

Dear Judge Kollar-Kotelly:

I would like to offer a character reference for John Hinshaw, who is awaiting sentencing for his participation in an anti-abortion protest in 2020. I am a deacon in the Catholic Parish in which John, his wife Brenda, and their family are active members. I have known John for about twenty years, and have worked alongside him in several parish programs. The nature of these programs are to affirm and encourage people from all walks of life to become better people through love of God and neighbor. For example, I have worked alongside John in welcoming and integrating new members who wish to join the parish, as well as working with young couples who are preparing for marriage in the church, and working with young families who will be bringing their children to be initiated in the church through the Sacrament of Baptism. I have always known John to be a "man for others", who gives generously of his time to help others without counting the cost.

I have known John to be a man of strong convictions, which led him to advocate and work tirelessly for those who are underserved or marginalized by society. His professional career as well as his personal life is centered around human dignity and the social and psychological parameters of the ordinary lives of ordinary people. John is a family man, who has always sacrificed for and led his family, instilling in his children the highest ideals of morality, fair play, and concern for others. It may sound cliché, but John is the model of a man who loves God, family, and country with all his being.

Although I admire John's integrity and moral rectitude, I can't help but feel considerable consternation regarding his participation in the events that led to his arrest and conviction. I struggle to understand or justify actions that stray outside the bounds of civility and legality. I can only speculate that John's strong convictions about abortion overcame his typical reasoned and rational demeanor, or perhaps he was emboldened by more recent disruptive and uncivil protests that have been in headlines the last few years (such as harassing U.S. Senators in restaurant restrooms, as well as Supreme Court Justices in their homes). Whatever John was or was not thinking, I only ask that you view his specific actions against the canvas of John's entire life. Although I know little about law or jurisprudence, I do believe that it is fair and appropriate to question the extent to which our society will either benefit from or be protected by incarcerating John for any length of time, especially when viewed in light of the detrimental burdens that incarceration would place on John's family.

I hope that this character reference will in some way help you to see the entire person of John Hinshaw, and not only the actions for which he was arrested and convicted. I would respectfully request that your considerations of justice be tempered with mercy, as well as the realities of any practical benefit (or lack thereof) of any significant incarceration.

Respectfully,

John Blakeney

To the Honorable Colleen Kollar-Kotelly
US District Judge
c/o Alfred Guillaume III
1350 Connecticut Ave NW Suite 308
Washington DC 20036

Your Honor,

I am happy to write this character reference letter for John Hinshaw who has been my friend for over forty years. My name is Mary Schmidt Roth . I live in Queens, NY. I am a registered nurse for over forty years working in various settings including the emergency and critical care areas in New York and on Long Island.

I met John Hinshaw when we were both volunteering to help a man who was running for county legislator. We got to talking, found we had common interests, and have been friends ever since. Over the years we have been to ball games, book club, picnics, tournaments, parties, the beach, vigils, weddings and funerals.

John has spent most of his career in social service. He is enthusiastic and speaks compassionately about his clients, the problems they face, and how they can be helped.

John is a family man. He comes from a large close knit family. He and his brother, Rick, also a long time friend, are very close. While they may joke and spar over differing views, they are always there to help each other. I recall how very upset John was when his sister was ill with cancer. John would visit her in the hospital and try to help out with her family. It really hurt him to see his sister so sick. He was always trying to think of ways to help.

John is a proud and loving father with six children. I can recall John talking about camping with his son, in a place he had gone to when he was young. He also talked about raising kids and the importance of helping them to have a positive attitude and to be grateful for what they have. I was happy to attend two of his children's weddings.

John is a very loyal friend. John's friend, Kevin, had cancer, and John and his wife Brenda, helped Kevin with his treatment and were with him while he was in hospice and arranged for the burial Kevin wanted. Kevin did not live close so it was a very large undertaking but something they wanted to do for their friend. When we were much younger, John basically taught me how to play tennis. That took great patience especially since I have no hand/eye coordination. More importantly, John was encouraging and he included me in team play even though it might cause him to lose a match. He always had a positive word.

John has many interests; sports, literature, history, religion, travel. He enjoys lively debate, whether it's about the likelihood of the Islanders winning, or the St Louis Cardinals beating the NY Mets, or whether Chesterton is a better writer than Belloc. The debate may be spirited but John does not make it personal. There's no malice towards those who disagree with him. It is an exchange of ideas.

John Hinshaw is a good man and has been helpful to many throughout his personal and professional life. John will be asset to his community when he is released.

Sincerely,


Mary Schmidt Roth

**WILLIAM J. DOYLE**

**23 CYPRESS LANE**

**SHIRLEY, N.Y. 11967**

November 17, 2023

The Honorable Colleen Kollar-Kotelly
US District Court Judge
c/o Alfred Guillaume
1350 Connecticut Avenue NW, Suite 308
Washington, D.C, 20036

Dear Judge Kollar-Kotelly,

I have known John Hinshaw for nearly 50 years. The guiding principle of his life is a deep seated belief in a loving, merciful, and just God.  John is a loving husband, father, and grandfather.  He has been dedicated to assisting the vulnerable members of our society in professional life by assisting individuals with mental/emotional illnesses and charitable work within the community.  These strong Catholic values also are the primary motivation for his pro-life convictions and call to action.

I also oppose abortion but recognize it as legal under the law and can only be ended by the action of law within a democratic republic.  I disagree with John's action at the clinic, but don't believe he is violent.  His actions were done in a spirit of prayer and not violence.  He must be accountable under the law, but a long prison sentence is not reasonable or just.

John is a good man.  In considering his sentence, please focus on the God fearing Catholic and loving husband, father, and grandfather.  Please show mercy and compassion in sentencing.

Sincerely,

William Doyle

# ST.BERNARD'S
## CATHOLIC CHURCH

3100 HEMPSTEAD TPKE • LEVITTOWN, NY 11756 • 516-731-4220 • FAX 516-731-4355 • www.stbernardchurch.org

November 6, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

Dear Judge Kollar-Kotelly:

I am writing on behalf of John Hinshaw, whom I have known in my capacity as Pastoral Associate at St. Bernard's Roman Catholic Church in Levittown, New York, for the past sixteen years.

I have worked closely with John and his wife Brenda in our parish's Baptism Preparation program, which I believe they have served in for well over twenty years. John has been a facilitator in this process, using his professional skills to assist parents who are presenting children for the Sacrament of Baptism to understand the importance of this undertaking, and to share examples from his own life about how to share faith with children as they grow and develop. The participants in this program over the years have been positively influenced by John's facilitation of these sessions, and have appreciated John and Brenda's insights and guidance.

I trust that you will take this ongoing good work that John has been engaged in into consideration as you determine his sentence.

Sincerely,

Diane Vella

Ms. Diane Vella, M.A.
*Pastoral Minister*

233 Beach 117th Street

Rockaway Park, New York 11694

November 16, 2023

The Honorable Colleen Kollar-Kotelly

United States District Judge

c/o Mr. Alfred Guillaume, III

1350 Connecticut Avenue NW

Suite 308

Washington, DC 20036

**RE:  John Hinshaw**

The Honorable Kollar-Kotelly:

We are writing this letter for John Hinshaw who is currently incarcerated in the Alexandria Federal Prison awaiting final sentencing from your court.

We have known John since late 1974. Although my husband and I were both active in VIVA, the Brooklyn NY right to life group, we would often meet John and work together with other young pro-life people in college throughout New York City and Long Island.

We often collaborated on educational campaigns on college campuses, health fairs and even some political campaigns. We also worked helping pregnant women who were in difficult situations find help and solutions to help their baby to be born. John was always a happy, friendly and kind person, with deep respect for all people born and unborn and always law abiding.

John grew up in East Meadow, Long Island NY. We know him and his brother Rick. They come from a strong Catholic family, always respectful and church attending. In fact, as we all went into our respective careers, his brother became the Editor for many years of the Long Island Catholic, the Rockville Centre diocesan newspaper.

Page 1 of 1

John and his family are a family that truly believes in the commandment "Thou shall not kill" and we would also consider him a "peacemaker".

John has been married to his wife Brenda for almost 37 years and they are the parents of six children. John and Brenda are also the grandparents to two young grandchildren.

In addition to raising his beautiful family, John has always found the time to volunteer doing good works throughout his community and town and parish.

His family and all of the people who his life has touched and helped will be bereft if he is incarcerated for a long period of time.

As I said before, John and the other people like him, have a complete and a truly sincere love and respect for all human life in all of its stages. Would that the world would be a far better place if more of us had the same reverence for life.

A long incarceration for John would indeed be a devastating blow to his large family and even his local community.

We respectfully urge you to sincerely reflect on these thoughts. We pray that you find this compassion in your heart and not sentence him and those similarly jailed to a long prison sentence.

Sincerely yours,

*Geri Haggerty*

*Tim Haggerty*

Geri and Tim Haggerty

718.634.3311

Page 2 of 2

November 13, 2023

<u>BY FAX</u>

Turner Mebane, Jr.
XUSPO Sentencing Consultants
10901 Rhode Island Avenue -Suite 344
Beltsville, Maryland 2704

**Re: My Character Reference for John Hinshaw**

To Whom it May Concern:

Regarding John Hinshaw the only thing I state about his character is that he is a person of the highest character. His concern for the welfare of others as opposed to himself is extraordinary. As far as I am concerned John Hinshaw is a Saint.

I have known John for 35 years. John is a wonderful husband, father and friend. John is a fan of the great Catholic writer *G.K. Chesterton*. I remember John complaining shortly before his wedding day that he had to deny himself a chance to hear a lecture on G.K. Chesterton because he had to attend a Pre-Cana Conference for engaged, soon-to-be-married couples that he could not postpone. I think John felt he could learn more about marriage by attending the G.K. Chesterton lecture than he could learn at that one night at that Pre-Cana Conference as good as it was. I suspect his soon-to-be wife Brenda would have agreed with him.

One thing that sticks with me about John is something he once said to me regarding the nature of violence. John said to me that a person will commit a violent act because he or she thinks it will bring a quick result. These people think that trying to achieve the same goal through a non-violent act will bring too slow a result. I often think of John's insightful comment on human nature when I see or hear of people hurting others or themselves by committing violent acts.

John is a person of the highest character and I am proud he considers me a friend.

Very truly yours,

*[signature]*

Gerard F. Crosson

221 Jackson Crescent
Centerport, New York 11721

**Patricia Shea**

53 Bay Drive • Massapequa • New York • 11758
516-798-3143
516-906-0412
Failte56@aol.com

November 17, 2023

The Honorable Colleen Kolar-Kotelly

Dear Judge Kolar-Kotelly:

I am the director of MOMMAS House, a residential program for young, pregnant/parenting women and their babies. This program grew out of a need for young women, who wanted to give birth and parent their child, but would become homeless if they made that choice.

It is a grassroots organization that began 37 years ago and continues to this day to meet the basic needs of this vulnerable population. As the founder, I am proud of all that has been accomplished but acknowledge that it could only happen with the volunteers and donors offering their support.

I have known John Hinshaw for many years and I have always known him to be a man of strength of character and deep faith. When he makes a commitment to help those whom others have ignored or rejected, he is all in, despite the personal sacrifices it takes. I have never known him to be violent or destructive. He reminds me of the pacifists of the 1960-1975 era, who peacefully demonstrated against the war and other injustices, who risked their personal freedom to defend those who could not defend themselves.

John is a family man, a good man in our community and he is always willing to help. John and his wife Brenda have volunteered at MOMMAS House and were willing to do whatever I would ask. He is concerned about the safety and welfare of our young mothers and wants them to have a home to start their life together with their babies. His presence in this world makes it a safer and more loving place to be.

Thank you for considering this letter when deciding his sentence. His family needs him home. If you give him that, it demonstrates how important a home is, especially to those who struggle to have one.

Sincerely yours,

Patricia Shea.

The Honorable Colleen Kollar-Kotelly,

I have known John Hinshaw since the mid-1970s. I would like to attest to his character. I am a professional investor and former president of an asset management firm. I would offer that two insights flow from that.

By way of background, we're what is called a "macroeconomics driven firm" meaning I spent the last several decades looking at the United States consumer and his/her propensity to develop wealth and alter his or her standard of living. A subset of that continuing review involves the migration between income brackets.

John has maintained a lifestyle dedicated to others, eschewing income for either himself or his family. He did provide, he did put a roof over their heads and clothed them. However, he did not move from helping the social welfare of the individual to a more lucrative career. He did not move from a lower income bracket to a higher one. In a word, he led a life of sacrifice for others. I was also responsible for assessing and hiring people over those years.

I have been relatively good at assessing what employees will be successful. John, with his quick mind and deep analytical skills would have gone far on Wall Street or whatever field he chose.I know this from my own experience, having seen what it takes for folks I hired as clerks rise to senior positions . John has those qualities. He chose not to. John chose to stay in the trenches. He chose to sacrifice for others.

Your honor, I have never written a letter like this. I asked a lawyer, a friend, what I should say. She said to avoid making it a testimonial. John has led his life in a way that makes testimonials unavoidable.  I struggle to understand how society would benefit from his removal. We as a society would be worse off.

Respectfully,


Mark McDonnell

To The Honorable Colleen Kollar-Kotelly,

RE: John Hinshaw

I met John Hinshaw in the Summer of 1976, through my beginning involvement with the Pro-Life movement.  I was 16 and John, his brother and a few of the slightly older members of the group treated me and my contemporaries like younger siblings. Nuances of this vital issues were explained as we campaigned for Candidates who shared our belief in the Sanctity of Human Life.   At 16, when most of my generation ignored this issue, finding a group of like-minded young people was truly refreshing.

We worked on Campaigns, but like most people our age, we had fun.   We laughed at silly inside jokes and became good friends.

My best memory of John involves a picnic we attended where the inevitable Softball game was played.  In a feat unmatched before or since, I managed to not only get a decent hit, I also caught a pretty amazing ball in the outfield.   At that moment, John announced that I was an awesome athlete and I should play on his team every time. Poor John was bound to be disappointed as he took all the games and sporting events seriously. It never mattered to him.  For John believed if I had performed that well once, I could do it again. But the feeling of being treated that way by John stays with me over 40 years later.

When John started dating his eventual wife, Brenda, I had a front row seat.  You just knew this was a love story destined to last.  And last it did, through 6 children and lifetime together.  I was delighted to dance at their wedding even though I had just given birth myself a few weeks prior.

John's commitment to what is Right and Good has always been a hallmark of him as a person.   I have vivid memories of him refusing to eat Burgers because of his strong Pro-Life Convictions.  Watching him explain how to ring up a Whopper with extra Cheese and no meat to a befuddled Burger King Employee still makes me smile.

While john's beliefs are strong and steadfast, his conviction to do the right thing has always marked him as a man of principle.  He did and does not condone hurting anyone due to his deep Pro-Life Beliefs.

Sincerely,

Regina Donovan McGovern

celticgina@gmail.com

516-707-3158

213 North 5th Street

Bethpage, NY  11714

November 15, 2023

The Honorable Colleen Kollar-Kotelly, United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

Your Honor:

My name is Clare Hinshaw, and I'm John Hinshaw's niece. Though I am now 33 years old and live in Northern Virginia, where I have resided for about ten years while working for a non-profit, throughout my childhood, my family lived about twenty minutes from Uncle John's family, so we saw a lot of each other. Throughout my life, Uncle John has been a model of someone who gives of himself for others without concern for himself.

The most poignant example of this in my life may seem small to others, but it had a tremendous impact on me.

At nine years old, I was diagnosed with severe anxiety disorder after a panic attack that caused me to hyperventilate, necessitating a 911 call and ambulance ride to the hospital. For several years after that, I lived in a state of constant fear bordering on—if not crossing into—paranoia. My lowest point came in the summer of 2001 when I was ten years old. I became so paranoid that I couldn't leave my house. Even walking to the end of the driveway caused me to collapse in hysterics. Worse, I was terrified of being separated from my mom, even for a few minutes. Because of that, she, too, found herself trapped in the house as any attempt to leave provoked a debilitating panic attack for me. As you can imagine, this made things very difficult for my parents, who, on multiple occasions, had to postpone important meetings and appointments due to my emotional distress.

On one occasion, after weeks of trying unsuccessfully to find a solution to this problem, my parents decided to try asking Uncle John and my Grandma to stay with myself and my brothers while they went to an appointment—hoping that I would feel safe enough with the two of them to push through the panic. None of us knew if my parents would actually be able to even get out the door. But Uncle John sat with me at the dining room table while Grandma entertained my brothers in the other room, and, for about two hours, he just listened to me read Calvin & Hobbes comics at him. That's certainly not the most useful way (or the most enjoyable way) for a busy adult to spend his Saturday afternoon. I'm sure he had better things to be doing. But he gave me that time just to sit with me and make me feel safe by letting me do whatever I needed to stay calm—no matter how much of a waste of time it must have been for him. Not that he ever let me feel that it was a waste of his time—as far as I knew then, he had thoroughly enjoyed listening to me read comics at him. Only as I've reflected on that experience as an adult have I realized what a sacrifice that must have been on his part.

And that's how Uncle John has always been—willing to stretch himself to help others but without any fuss. There's a quote I heard in a movie once, "Houses filled with love have elastic walls." That's how I think of Uncle John and Aunt Brenda, though not just with their house, but with their time and energy. Uncle John is the type of person who can always be counted on when someone is in need to make the room or the time or the energy for them—whatever is needed.

In fact, during the trial, Uncle John and I were walking to dinner one evening when a homeless man approached us. Uncle John not only dug through his pockets to find some cash for the man but took a few moments to stop and talk with him. That's not something you see often in DC—or New York, where we're from. Most people don't make time for others, especially the homeless, at the best of times, let alone in the midst of one of the most stressful experiences a person can go through. Through this simple interaction, Uncle John reminded me of how I should be making time to treat everyone I encounter with respect and dignity. And he's been teaching me such things throughout my life.

When I was baptized as an infant, my parents asked Uncle John to serve as my Godfather. In asking him to fulfill this role, they demonstrated their trust in him, both to serve as my guardian if anything were to happen to them and to set an example for me of how to live a good life. In reflecting on what I wanted to say in this letter, I realized that he's fulfilled that role more perfectly than I realized. Uncle John has been a consistent presence in my life, and because of that, it was easy to overlook what a profound impact he's had. But, looking back, I can see that I'm a better person because of his influence.

Mother Teresa said, "Not all of us can do great things. But we can do small things with great love." That's my experience of Uncle John: working long hours to support his family, giving up his time to help those in need, making space in his own home for family members who needed a place to stay, volunteering at his church, showing love and patience for those who struggle with mental illness, and all of it without complaint, usually with a smile and a joke.

This is the kind of person he has always been—the kind of person who is a benefit to his friends, his family, and his community. I would humbly ask you to consider if incarcerating such a man is the best decision for our society.

Thank you for your consideration.

Sincerely,

Clare Hinshaw

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Ave. NW
Suite 308
Washington, DC 20036

Your Honor,

My name is Arlene Winters, and I am John Hinshaw's younger sister. I am a retired
public school teacher, having taught early childhood and elementary students for 28
years.

John was a high school teacher before committing the rest of his adult life to working
with mentally ill patients. The love and care he has for his clients is so evident in the joy
he has every day. I remember him leaving a family gathering early to get to his second
job in anticipation of taking his clients to a professional baseball game that night. I
learned from my brother's example how important it is to have a career that serves
others.

In my personal life, John has helped me weather two major crises. One was my divorce
when my two children were in elementary school, and we lived across the country from
my mom and siblings. John's encouragement and training in dealing with depressed
people in crisis helped me to function each day and stay focused on my children and my
students.

The second crisis was the cancer diagnosis of our youngest sister.  John was
instrumental in getting her the hospital care she needed, and she trusted him and his
knowledge of the healthcare system. He helped me obtain guardianship of her 10 year
old daughter. My sister died three years later but we were at peace knowing that my
niece had those 3 years to get used to a new home and school and make new friends
before she had to deal with the death of her mother. It was John's help, knowledge and
caring that made that possible.

Along with helping so many others, John's first priority has always been loving and
caring for his immediate family: his wife, children and new grandchildren. I am so glad
he is my brother!

Sincerely,


Arlene Winters

November 14, 2023


The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036


Greetings Your Honor,

My name is Patrick Campbell and I'm the Director of Student & Professional Activities for Long Island University's Arnold & Marie Schwartz College of Pharmacy and Health Sciences in Brooklyn where I've worked for over 30 years.

I am honored to write this letter of character reference for John Hinshaw. I've known John and his brother Rick for over 45 years and met them when I was an impressionable teenager. John was inspirational and made a strong positive impression on me and a group of friends I had at the time. We joined a group he formed called Long Island Youth for Life and Justice (LIYFLAJ).

For several years, I joined John and the group when they went down to Washington DC on January 22nd each year. One year we were part of the official program and sang folk songs in front of thousands of people at the rally. These were memorable experiences.

My contact with John over the years has been sporadic but I have kept tabs on him through friends. Then, as now, I know that John is one of the kindest, most ethical people I have ever met. He can also be goofy and a knucklehead and a very funny guy. Hearing of John's imprisonment has been devastating and I pray for him to have the strength and courage to get through this ordeal.

I wish I could provide more in-depth details. Writing this letter is a small task I am happy to do for him. If there is anything more I can do to help win his release or provide support, please contact me.

Thank you,

*Patrick Campbell*

Patrick J. Campbell
Patrick.Campbell@liu.edu
Director of Student & Professional Activities
Arnold & Marie Schwartz College of Pharmacy and Health Sciences
Long Island University
(631) 935-4902 cell

The Honorable Colleen Kollar-Kotelly United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

To The Honorable Colleen Kollar-Kotelly United States District Judge

My name is Theresa Davila, I am one of John Hinshaw's 6 children. I am a Radiologic Technologist and currently a new mother to a baby boy. I have known John for as long as I've been alive, about 30 years, he is the person who raised me and taught me how to be the hardworking and selfless person I am. My father has always been there for his friends and of course his family. I was an athlete for all my life and my father made sure to be at as many games and meets as he could be, I could count on two hands how many of those games and meets he missed during my 20 plus years of playing soccer and running track. Even as an adult playing in an adult soccer league he still came to my games to cheer me on. That's because John Hinshaw is a family man. When I was younger when people asked what my father did I always said he helps people and as I got older I knew his actual job was in the Mental Health field. My whole life I knew my dad to always help anyone he could, whether it was a client at work, a family member, a friend or even a complete stranger. He was always the type of person who would sacrifice his time to help in any situation. I will share a few examples. When I was young my  aunt, my fathers sister, became very ill, I watched my father work tirelessly to get her the care she needed and help take care of her young daughter  and eventually he arranged everything for her to move back to Texas to be with the rest of her children for her final months on earth, those arrangements included having help to care for her young daughter. Growing up I learned the value of friendship from watching my father hold his friendships so close to his heart. My godfather was one of my dads oldest and dearest friends, Kevin Clancy. When my godfather became very ill, my father showed the true meaning of friendship. My Godfather had strained relationships with his siblings at the time he was placed on hospice but my father was at his bedside every weekend and was in constant communication with his hospice care. At a time where someone who had no family would otherwise be alone my father was there with him until his last breathe. He showed his friend just how much there friendship meant to him and everyone who knows John saw just how devoted John  is to the people in his life. There are plenty of other people who my father has helped a lot of them being his clients so I don't know their stories but I know someone doesn't do a job for 40 years and stay in that same job if they aren't helping. As I said in the beginning of this letter I am a new mother, and motherhood as been hard, especially in the beginning as my son was in the NICU, and since becoming a mother everytime my dad came over, or called or texted me he was always checking on me and helping me in anyway he could,  his little girl because that's who I'll always be its who all my sisters will always be to him.Knowing my dad was there for me during the hardest time in my life is what helped me get through it. I know John will continue to help everyone and anyone in his life when he is released. He will return to his job in the mental Health field helping guide people who struggle with Mental Illness and in the world today is such a blessing to know that there is someone working in the field who cares so much for his clients.

Sincerely,


Theresa Davila

7011 Dreams Way Court
Alexandria, VA  22315
November 15, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillame, III
1350 Connecticut Avenue, NW
Suite 308
Washington, DC  20036

Dear Judge Kollar-Kotelly:

My name is Chris Braunlich and I write on behalf of John Hinshaw from the perspective of a friend and that of a former eight-year school board member in Fairfax County, in which capacity I frequently was required to make judgments about students who had committed expellable group offenses, individually determining both their culpability and the consequences of removal from public education.

I have known John Hinshaw for more than 45 years, having met on opposite sides of a political campaign. Despite our differences over candidates, John's demeanor remained friendly and congenial and, unlike the environment in which politics operates today, he never made those differences personal.

John has always been among the most thoughtful and introspective individuals I have known, guided by a deep consideration of the human condition and dedicated to helping others who are at risk. While I understand the reality of John's criminal conviction, experience with student expulsion hearings demonstrated to me the degree to which individual involvement in group actions often varies and suggests consideration of flexible consequences.

For four decades as a mental health professional and social worker, John Hinshaw has helped those in crisis, working as a one-on-one counselor and in group homes helping those in need to obtain basic services, stabilize their lives and re-enter society. These are among society's most fragile and least understood. John was there for them. He frequently found himself called in at the last minute, staying overnight in the group home to assist an individual through a challenging situation. It takes a special person to do this; an even more dedicated person to do it for four decades.

With an average behavioral health employee turnover rate as high as 37 percent, such employees have always been hard to find. Post-Covid, it is even harder. I am told John's last employer, the Mental Health Association of Nassau County, wants him back. And I am told his clients/patients are asking about him, adding uncertainty to the lives of those who need certainty most.

The Honorable Colleen Kollar-Kotelly
Page Two
November 15, 2023

I do not doubt that John would return to his profession of helping others if he is permitted and able to do so.  At the age of 68, and with a heart condition, doing so quickly would enable his positive integration into society at a time when the benefit to society might be maximized.

In rendering penalties, I would ask the Court to consider John Hinshaw's individual circumstances, his past and potential contributions to society, and his relative involvement in execution of the offense.

Sincerely,

Christian N. Braunlich

7011 Dreams Way Court
Alexandria, VA  22315
November 15, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue, NW
Suite 308
Washington, DC  20036

Dear Judge Kollar-Kotelly,

My name is Eileen Braunlich, and I write on behalf of John Hinshaw.  I am a Registered Nurse practicing in Home Health, both in New York City and in Northern Virginia since 1975.  I have known John Hinshaw for about 46 years, initially engaged in community activities and then a personal friendship.

While distance (we moved to Virginia), family obligations, (marriages and children), and other time constraints have made visiting more difficult over the years, we have remained in touch, through mail, internet and via mutual friends.

John is a person of great empathy, with a strong commitment to helping others whenever and wherever he can, be they family and friends, those he meets at work, and in the community, including strangers. Through the years, in conversations, we have shared the challenges of providing excellent care to those entrusted to us.

Community health care work, in each of our work sites, requires patience, kindness, an ability to see the whole person within their life situation. The capacity to do this allows for each individual's needs to be addressed and met, thus achieving their maximum potential.  John chose to pursue this work with the mentally and emotionally ill throughout his career, and would continue to serve others in the future, where his care is desperately needed.

John had and has an avid interest in tennis, and continued playing regularly for enjoyment  and health reasons.  Some of our friends (including me) did not, so John went ahead with patience and humor, to teach us the strokes and techniques to participate in the games.

In all these, a trait that makes all things manageable is having a good sense of humor, which John possesses an abundance of.  From our youthful antics to defusing difficult times as a parent, John has had the ability to effectively tap into that.

In conclusion, I believe that John utilizes all these: empathy, patience, a work ethic putting the client first in all things, humor and kindness.  Above all is his ability to walk with each person in crisis, using calm understanding, to help them overcome their latest obstacle.  He is a caregiver sorely needed in today's community health crisis.

Sincerely,

Eileen M. Braunlich, BSN, RN, CWON

232 West Trenton Avenue
Morrisville, PA  19067
November 13, 2023

The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume III
1350 Connecticut Avenue, NW
Suite 308
Washington, DC  20036

Dear Judge Kollar-Kotelly,

Thank you for taking this opportunity to know more about John Hinshaw as a person.  I first met John in 1978 and he has been a friend ever since.  He is patient and funny, qualities evident even decades ago when he attempted to teach me how to play tennis.  He is a loyal and dependable friend. John served as a groomsman in my wedding.  Later, when he and my husband planned a two-week canoeing journey through the Adirondacks, I knew I could rely on John to make sure they got home safely.

After the birth of my first child I experienced post-partum depression.  When John learned of this he spent his day off driving the 140 mile round-trip to our home so that I could spend the day out with his wife, Brenda.  He is that kind of friend, the kind who shows up when you didn't know you needed him to.

He and our youngest daughter discovered a shared love of Spain; the country, its history and its culture.  It was a pleasure to see them together.  John is an attentive listener who asks thoughtful questions and our then-teenager knew that she had been heard and taken seriously.

These qualities of John's, which I have experienced as a friend, have served him well in his work as a counselor and advocate for the mentally ill and the socially disadvantaged.  John has a quiet generosity of spirit.  He meets and tries to know each person as a unique individual.

His absence will be a loss not only to his family and friends but, to the greater community which he has selflessly served and to which I hope he can soon return.

I am fortunate to have such a friend.

Thank you for your time and attention.

Sincerely,

Janet F. Drohan

November 12, 2023

To The Honorable Colleen Kollar-Kotelly:

I am writing in support of John Hinshaw's character in light of his sentencing trial. I am his cousin by marriage, originally from NY and now residing in Boston, MA with my family.

Cousin John is incredibly devoted to his wife, my cousin, Brenda, and his six children as well as two grandchildren. John has always worked two jobs to support his family and I know he treasures free moments with them.

Regarding John's character, as an Art Therapist who works with youth struggling with mental health issues myself, I value John's important work as a Social Worker. He is a long-standing example of service to the mentally ill - both in relationships formed and in securing services and benefits for them and their families. He always places family at the center of his life and service to others.

I ask you to consider this in his sentencing as I believe returning to his family, social work and spending more time with his grandchildren would be the best next step for all of them.

Thank you for your consideration.

Sincerely,

Erin M Palazzolo Loparo (Nov 12, 2023 18:09 EST)

Erin M. Palazzolo Loparo
Boston, MA

ALLISON RICCIARDI, LMHC
*Licensed Mental Health Counselor*
PO Box 360185
Melbourne, FL 32935


The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Avenue NW
Suite 308
Washington, DC 20036

November 26, 2023

Re: John Hinshaw

Dear Judge Kollar-Kotelly,

My name is Allison Ricciardi and I am a Licensed Mental Health Counselor in private practice for the past 33 years.

I met John Hinshaw in the mid 1980's through mutual friends. I was immediately impressed with his intellect and kindness. Over the years we became friends and colleagues. John was working as a case worker with MICA (Mentally Ill, Chemically Addicted) patients and also part time at a group home for mentally challenged adults. He was always dedicated and compassionate with his clients. Despite the mental drain that kind of work can put on a person, John's regard for the dignity of his clients and his desire to make their lives better seemed to insulate him from burn out and kept him going strong.

During the late 90's and early 2000's John and I worked closely together counseling clients with a wide array of problems. John was always insightful, compassionate and respectful of his clients. I got consistently great feedback from those that I referred to John for counseling. John and I also teamed up on certain cases, particularly those with marital challenges, so I had a chance to see John's approach first hand. He was an excellent counselor and his clients truly loved and appreciated him. His respect, patience and persistence were instrumental in enabling clients to heal and grow.

I also had the privilege of being friends with John and his wife Brenda. John has always been a dedicated husband, father, and now grandfather, who takes his commitment to loving and serving his family as his top priority. He has a great sense of humor and a deeply caring heart and has maintained many lifelong friendships because of those qualities.

John has strong convictions by which he orders his life and a commitment to peacefully resolve whatever issues or conflicts are presented to him. I believe that for those lucky enough to be in his orbit, the world is a better place and they are richer for knowing him.

Thank you for your kind attention and consideration.

Sincerely,

Allison Ricciardi, LMHC

**Anthony J. Ruocco**
412 Deer Rd.
Ronkonkoma, NY 11779
(516) 318-7515
aruocco1988@gmail.com

November 27, 2023

Attn:
The Honorable Colleen Kollar-Kotelly
United States District Judge
c/o Alfred Guillaume, III
1350 Connecticut Ave, NW
Suite 308
Washington, DC 20036

To whom it may concern,

Please allow me to introduce myself. My name is Anthony Ruocco. I reside in Ronkonkoma, NY with my wife, two children and two dogs. I am a civil service employee working for a school district here on Long Island.  The reason for my introduction is to write to you about a dear friend of mine, John Hinshaw

I have had the pleasure to know John and the entire Hinshaw family for the past 25 years. John's son, John Paul & I had grown up together in the same neighborhood. John is a husband is a loving father to his 6 children. A hardworking man always ensuring the well-being of his family, John always found the time to be there for those around him. The Hinshaw family over the years became an integral part of the Levittown community. Their friendship, dedication to their faith, and strong moral values have made a long-lasting positive impact on those around them. And it could have been done without John.

Despite the challenges the family is currently facing, they always are there to support others in need. Unfortunately, I had lost my mother to a battle with cancer a few months ago. While she was ill for the past year and a half, I cannot thank John and the Hinshaw family for the support, demonstrating their compassion and kindness during that difficult time.

During this unfortunate sentencing which I believe is out of his character, I kindly request the court to take into consideration these positive words about John. I believe that John is a respectful, upstanding citizen. A man who is selfless, always putting those around him first over himself. Please, if you need any other information, do not hesitate to contact me at the information listed above.

Sincerely,

Anthony J. Ruocco (Nov 30, 2023 19:41 EST)

Anthony J. Ruocco